**David Wayne SPENCE, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 69341.**

Court of Criminal Appeals of Texas, En Banc.

June 13, 1990.

**746**

L. Hayes Fuller, III, Russell D. Hunt, Waco, (Court Appointed), for appellant.

Vic Feazell, Dist.Atty., R.D. Rucker, Asst.Dist.Atty., Waco, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

PER CURIAM.

David Wayne Spence, appellant herein, was convicted of the offense of capital murder, namely, the capital murder of Jill Montgomery, henceforth Montgomery, one of the victims of the "Lake Waco" mur-

ders, while in the course of committing the offense of aggravated kidnapping of Montgomery. *See* V.T.C.A.Tex.Penal Code, Sec. 19.03(a)(2). After convicting appellant of capital murder, the jury answered the submitted special issues in the affirmative. *See* Art. 37.071(b)(1) and (2), V.A.C.C.P. Therefore, appellant's punishment was assessed by the trial judge at death. Appeal from the trial court to this Court is automatic. *See* Art. 37.071(h), V.A.C.C.P. We affirm.[1]

Appellant does not challenge the sufficiency of the evidence at either the guilt or the punishment phase of the trial; therefore, we will dispense with all but the most cursory recitation of the facts and directly address appellant's points of error.

On July 13, 1982, around 8:00 p.m., near dusk, Montgomery and her friends Rice and Kenneth disappeared after going to Koehne Park, which is located on Lake Waco. Their bound and tortured bodies were discovered in the woods of nearby Speegleville Park the next day. All of the bodies had numerous knife wounds which were described by Dr. M.G.F. Gilliland, the pathologist, as "torture wounds." Both females had several human bite marks on their chests and shoulders. Both had been raped. Gilliland testified that all three of the victims died as a result of multiple stab wounds.

Appellant presents thirteen points of error in this appeal: Appellant complains in one point of error that he was not allowed to make an adequate offer of proof at trial for this Court to assess the validity of his pretrial motion to dismiss the indictment. He attacks, in three points of error, the admission of evidence linking him to the crime by a comparison of his dental arrangement with the bite marks left on the female victims. He contends, in two points of error, that he should have been allowed to explain the law of circumstantial evidence to the prospective jurors during voir dire examination. In one point of error, he

1. This Court also affirmed today, in an unpublished opinion, appellant's capital murder conviction and sentence of death involving the murder of Kenneth Franks, henceforth Kenneth, who was another victim of the "Lake Waco" murders. *See Spence v. State*, 790 S.W.2d 339 (Tex.Cr.App.1990). The third and last victim was Raylene Rice, henceforth Rice.

asserts that he should have been allowed to bring evidence before the jury that tended to show that someone else may have committed the capital murder of Montgomery for which he was charged in this cause. Appellant's remaining seven points of error attack the trial judge's decision to admit several types of testimony, namely: testimony from Daryl Beckham, henceforth Beckham, a witness who had been previously hypnotized; testimony from Jerry Jennings, henceforth Jennings, a witness who allegedly was compensated by the State for his testimony; testimony at the punishment phase of the trial by Lisa Kader, henceforth Kader, a woman who was raped by appellant; and testimony by Dr. James W. Jolliff, henceforth Jolliff, a psychiatrist who testified that appellant was a menace to society. We overrule all of appellant's points of error and affirm his conviction and sentence of death.

In appellant's first point of error[2], he maintains that he was not allowed to make a complete offer of proof on his contention that the State improperly delayed his indictment, causing substantial prejudice to his defense.

Appellant's pretrial motion to dismiss the indictment averred that his right to due process of law under the Fifth and Fourteenth Amendments to the United States Constitution was violated by the State's deliberate action of delaying the return of appellant's indictment. The record reflects that at the pretrial hearing to dismiss the indictment, appellant's counsel was not allowed to present testimony or make an offer of proof in order to support his claim. Thus, appellant claims that there was no evidence in the record upon which this Court can review his claim.

The record, however, is now complete. On October 12, 1988, this Court ordered that appellant's appeal be abated and remanded the case to the trial court for a hearing so that appellant could properly, although belatedly, perfect the record on his motion to dismiss the indictment. This Court ordered the trial judge to conduct a hearing on *"only* that testimony and evidence excluded by the Court at the pretrial hearing to which counsel objected and made a thwarted offer of proof." (Emphasis supplied.) *Spence v. State*, 758 S.W.2d 597, 600 (Tex.Cr.App.1988). At the hearing on remand appellant asked the questions which he had originally asked at the pretrial hearing, but which he did not receive answers to at that time. Appellant also asked additional questions which were in response to the testimony given at the hearing on remand. At the hearing on remand, however, the trial judge allowed appellant to go into not only those matters which were originally raised at the pretrial hearing but also those reasonably related to them. We find that appellant was given extremely wide latitude by the trial judge in presenting evidence on several issues. The State objected to most of this evidence on the ground of irrelevance, but the trial judge allowed appellant to introduce it as a "bill on the bill."

Appellant now complains, in his first point of error, that he was not even allowed a "bill on the bill" regarding the following: (1) the evidence that was presented to the Grand Jury to obtain the indictment; (2) the dates upon which the District Attorney first obtained such evidence; and (3) the action that was taken against appellant by the District Attorney between the time the evidence was obtained and the time it was presented to the Grand Jury. Appellant also contends that he should have been granted discovery of the Grand Jury testimony and relevant parts of the District Attorney's files. Thus, appellant contends that his attempt to perfect the record to show deliberate, prejudicial, pre-indictment delay was again thwarted.[3]

---

2. Appellant's first point of error reads:

The trial court reversibly erred in refusing to permit defense counsel to make an offer of proof in support of appellant's motions to dismiss.

3. We pause here to note that the evidence which was introduced at the hearing on remand was relevant to appellant's pretrial motion to dismiss the indictment and should have been admitted at the initial pretrial hearing. It was error for the trial judge not to have considered

Appellant's complaint before us now is that he was not allowed to make an offer of proof as to the dates that the District Attorney's office obtained the evidence used against him and as to what action was taken between those dates and the date of his indictment, November 21, 1983. We infer from the record that appellant became a suspect around September 9, 1982, or near the time when he was arrested and incarcerated in the McLennan County Jail on an unrelated aggravated sexual assault charge, for which he was convicted and sentenced to serve 90 years in the penitentiary.[4] We find that appellant's questions were sufficiently answered at the hearing on remand.

The record reflects that Vic Feazell, henceforth Feazell, who was then the District Attorney for McLennan County, and who was also one of the prosecutors at appellant's trial, testified at the remand hearing. In regard to the investigation and evidence against appellant, Feazell testified that "nobody came with a suitcase and laid it on the library table with the evidence in it. This evidence was gathered bit by bit, piece by piece. There is not a cut off time when evidence was obtained." In response to the question of how long prior to the indictment the evidence which was presented to the Grand Jury was obtained, Feazell replied that he could not specifically recall.

When asked why appellant was not indicted sooner than he was, Feazell said that he waited to present the case to the Grand Jury until he was "ready" and "confident." He also testified that the District Attorney's office worked on the case right up to November 21, 1983, the date the indictment was returned. Feazell was asked: "Once you had obtained all of the evidence which you ultimately presented to the Grand Jury, was there any reason for you not to have the case indicted at that time?", and he responded: "We did have it indicted at that time." Feazell further testified

that evidence was being obtained "[u]p to and through trial."

It is clear from the record that the factual circumstances of this case are unique. Appellant, Anthony Melendez, henceforth Anthony, Gilbert Melendez, henceforth Gilbert, who were brothers, and Muneer Deeb, henceforth Deeb, were all indicted in the same Grand Jury proceeding for the capital murders of Montgomery, Rice, and Kenneth. When asked if he had enough evidence to indict one of the defendants before the others, Feazell responded that he believed that he had enough evidence to indict appellant and the Melendez brothers, and, while he was waiting for the Grand Jury to assemble, he gathered enough evidence to seek an indictment against Deeb. Feazell also testified that he could not recall any evidence being obtained in the time period from August 30, 1983, when appellant was transferred from the McLennan County Jail to the penitentiary to commence serving his 90 year sentence on the unrelated aggravated sexual assault case, until November 21, 1983, the date the indictment against appellant was returned by the Grand Jury.

In response to appellant's complaint that he should have been granted discovery of the Grand Jury testimony, raised on remand by a post-trial motion for discovery, the trial judge ruled that he did not believe that he had jurisdiction to rule on the motion, given the wording of this Court's order of remand. The trial judge stated that the testimony "has already been transcribed, and went (sic) up as part of the record in this case, sealed, and it is in the Court of Criminal Appeals in Austin, so I assume that if there was any discovery to be made, it would have to be from the Court of Criminal Appeals."

Appellant also asserts that Feazell should have been instructed to answer his question concerning what evidence was presented to the Grand Jury. However, this was just another way of asking for the

---

this evidence before overruling appellant's motion to dismiss the indictment.

**4.** Appellant's conviction and 90 year sentence, as reformed, were affirmed in an unpublished

opinion by the Waco Court of Appeals. *See* *Spence v. State,* 10th Court of Appeals, No. 10–83–062–CR, May 24, 1984.

testimony from the Grand Jury proceeding which was already the subject of the post-trial motion for discovery. The Grand Jury testimony was sealed by order of the trial judge and was submitted with the record on appeal to this Court.

■ We have reviewed the testimony presented at the Grand Jury proceeding and have searched the State's files (which were also made a part of the record on appeal) in order to find some evidence to support appellant's claim of undue preindictment delay. After doing so, we find that testimony from two of the three witnesses who testified before the Grand Jury match the statements which they gave to investigators prior to the Grand Jury proceedings. The earliest date on which the State had obtained statements from both of these witnesses was July 1, 1983. It is clear from the State's files that at least one of these witnesses was still being interviewed by the State, at least until September 30, 1983.

The most delay that these records show is from July 1, 1983, until November 21, 1983, the date on which the indictment was returned. There was testimony at the remand hearing that the Grand Jury only met once a month during 1983; therefore, the period of delay ranges from four months and 21 days to, assuming the Grand Jury could not be assembled immediately upon request, but only in the next month, three months and 21 days.

Cases which have established and fleshed out the claim of undue preindictment delay arising under the Due Process Clause of the Fifth Amendment have not directly addressed the issue of how much delay is too much delay, nor have they established a bright-line rule. For a discussion of the relevant factors that are ordinarily used in deciding the issue, *see Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

In *U.S. v. Lovasco*, 431 U.S. 783, 790, 97 S.Ct. 2044, 2049, 52 L.Ed.2d 752 (1977), there was a seventeen month delay between the time that the prosecutors received the information upon which they ultimately indicted the defendant and the time that he was actually indicted. The prosecutors argued that they waited because they thought other defendants may have been involved in the crime. The district court found undue preindictment delay to exist and ordered the indictment dismissed. The appellate court affirmed. The Supreme Court, in reinstating the indictment, held that

the Due Process Clause does not permit courts to abort criminal prosecutions simply because they disagree with a prosecutor's judgment as to when to seek an indictment. [P]rosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt.

*Lovasco*, 431 U.S. at 790–791, 97 S.Ct. at 2049.

This holding was, in part, based on language from *U.S. v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), the seminal case in this area. *Marion* established the following:

[T]he Due Process Clause of the Fifth Amendment would require dismissal of the indictment if it were shown at trial that the preindictment delay in this case caused substantial prejudice to appellee's rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused. Actual prejudice to the defense of a criminal case may result from the shortest and most necessary delay; and no one suggests that every delay-caused detriment to a defendant's case should abort a criminal prosecution.

*Id.* at 324, 92 S.Ct. at 465.

The Supreme Court further limited the scope of the protection provided by the Due Process Clause of the Federal Constitution in this area.

Investigative delay is fundamentally unlike delay undertaken by the government solely to gain tactical advantage over the accused. We therefore hold that to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been

somewhat prejudiced by the lapse of time.

*Lovasco,* 431 U.S. at 795–796, 97 S.Ct. at 2051–2052. *See also U.S. v. Townley,* 665 F.2d 579, 582 (5th Cir.1982), cert. denied 456 U.S. 1010, 102 S.Ct. 2305, 73 L.Ed.2d 1307 (1982) (Held, delay against defendant was only partly for investigative reasons; therefore, second prong of the claim, prejudice to defendant, was required to be proven.)

■ It was error for the trial judge in this cause not to have considered the testimony which was elicited at the remand hearing, and it was also error for the trial judge not to have allowed full discovery of all non-privileged material both at the initial hearing and on remand. Nevertheless, we hold, as a matter of law, that it would have been improper for the trial judge to have granted appellant's motion to dismiss the indictment on the ground that the State's deliberate preindictment delay caused substantial prejudice to his defense, because appellant did not establish his claim.

Appellant has been able to show delay [5]; however, he has not met his burden to show that it was intentional delay which was designed to give the State a tactical advantage over him. *See Marion,* 404 U.S. at 324, 92 S.Ct. at 465. Moreover, appellant has failed to show what harm he suffered as a result of the delay.

Appellant's first point of error is overruled.

■ Appellant, in three points of error, contends that any evidence introduced by the State, which was derived through the comparison of his bite pattern with the bite marks which were left on the bodies of Montgomery and Rice was erroneously admitted by the trial judge.[6]

The record reflects that while appellant was in the McClennan County Jail, following conviction on a separate charge of aggravated sexual assault, law enforcement officials obtained a court order directing him to allow impressions to be made of his teeth. This order was served on appellant on May 4, 1983, approximately six months before appellant was indicted for the offense at bar. Before submitting to the taking of his dental impressions, appellant wrote across the bottom of the court order, "I consent to this under protest and asked for my attorney (sic)." These impressions were later used by Dr. Homer Campbell, the State's forensic odontologist, henceforth Campbell, to connect appellant with the female murder victims.

Appellant argues under his fourth point of error that Campbell's testimony was inadmissible because it was based on methods which were not proven by scientific principals and also because forensic odontology is not recognized by the scientific community.

Research informs us that in order to make an identification of a suspect by use of bite mark evidence, it is necessary to gather data about the bite mark, compare it with data from the suspect, and evaluate the significant similarities or dissimilarities revealed by the comparison. In evaluating these similarities, the forensic odontologist uses an identification system which requires a certain number of points of similarity before positive identification is made. Note, "The Admissibility of Bite Mark Evidence," 51 *S.Cal.L.Rev.* 309 (1978). It appears that the "scoring system" of the American Board of Forensic Odontology for human bite marks is an

---

5. The delay which appellant has proven, however, falls within the ambit of delay for investigative reasons, and, furthermore, is the same type of delay as that which was present in *Lovasco.*

6. Appellant's fourth, fifth, and sixth points of error, respectively, read:

The trial court reversibly erred by failing to exclude the testimony of forensic odontologist Homer Campbell because his testimony was based on methods which were not proven by

scientific principal and are not recognized by the scientific community.

The trial court reversibly erred by overruling appellant's objection to the admission of bite-mark evidence obtained in violation of appellant's right to counsel.

The trial court reversibly erred in overruling appellant's objection to the admission of teeth impressions evidence obtained without a search warrant.

ongoing quest. *See* 31 *J. Forensic Sci.* 1261 (1986), and 33 *J. Forensic Sci.* 20 (1988). The authorities all appear to agree at this time that there is not yet a large enough data base regarding bite mark characteristics to say with certainty that each individual's dentition is unique. Luntz and Luntz, *Handbook for Dental Identification* 140 (1976). There is, however, unanimous agreement in the field of scientific odontology that if even one point of dissimilarity is found between the suspect's dentition and the bite mark then it may be said with certainty that the suspect did not make the bite mark. Thus, that suspect may be eliminated. Sopher, *Forensic Dentistry* 140 (1976); 25 *Am.Jur. Proof of Facts* 765–785. In this instance, appellant was given the opportunity to cross-examine and attack the validity of Campbell's comparison evaluation and examination of the bite mark evidence. Furthermore, appellant himself had Dr. Gerald Vale, henceforth Vale, an extremely qualified forensic odontologist, testify on his behalf. Campbell and Vale appear to be recognized as two of the leading experts in the field of forensic odontology. Thus, there was truly a battle between two of today's leading experts in the field of forensic odontology at appellant's trial.

This Court in *Doyle v. State,* 159 Tex. Crim. 310, 263 S.W.2d 779 (1954); *Patterson v. State,* 509 S.W.2d 857 (Tex.Cr.App. 1974), and *Marquez v. State,* 725 S.W.2d 217 (Tex.Cr.App.1987), without discussing what predicate must be laid before bite mark evidence becomes admissible evidence, approved the admissibility of bite mark evidence. Interestingly, *Doyle* is reported to be the first case in these United States that involved the admissibility of bite mark evidence. *See* Wilkinson and Gerughty, "Bite Mark Evidence: Its Admissibility Is Hard to Swallow," 12 *Western State University Law Review* (1985),

at 529. It appears from *Doyle* that if a State's witness, no matter what his expertise might be (in *Doyle,* the expert was a firearms examiner), is willing to testify that bite marks that are found on some object match the teeth prints of the accused, that is sufficient to authorize at the accused's trial the admissibility of the witness' expert opinion testimony that the bite marks were made by the accused's teeth.

Appellant asserts that the field of forensic odontology or dentistry is not one that is generally accepted in or by the scientific community, thus causing any scientific opinions or conclusions that Campbell might have drawn from his comparison evaluation and examination of the photographs that depicted bite marks on the bodies of Montgomery and Rice and appellant's teeth impressions not to be valid. We infer from appellant's arguments that appellant is asserting that because such evidence is more suitable to exclude, rather than include, the individual as the one whose teethmarks were left on the object, that this renders such testimony inadmissible, and furthermore, that because forensic odontologists disagree on the minimum number of concordant points of similarity sufficient to express a categorical opinion on positive identity or on probable identity, that this also renders such testimony inadmissible; and, lastly, because bite mark evidence has no statistical background data forming a solid objective basis for the odontologist' conclusion, such testimony should not be admissible in a court of law in this State.

Although not finding unanimous agreement on what should be the proper predicate in determining whether bite mark evidence should be admissible, our research has not yet led us to a reported case where bite mark evidence has been ruled not to be admissible evidence.[7] In fact, courts in

---

7. Some of the cases in which such has been held to be admissible are the following: *See Bludsworth v. State,* 98 Nev. 289, 646 P.2d 558 (1982); *Bundy v. State,* 455 So.2d 330 (Fla.1984); *Chase v. State,* 678 P.2d 1347 (Ak.App.1984); *Commonwealth v. Cifizzari,* 397 Mass. 560, 492 N.E.2d 357 (1986); *Kennedy v. State,* 640 P.2d 971 (Okla.Crim.App.1982); *Niehaus v. State,* 265

Ind. 655, 359 N.E.2d 513 (1977), cert. denied, 434 U.S. 902, 98 S.Ct. 297, 54 L.Ed.2d 188 (1977); *Marx v. State,* 54 Cal.App.3d 100, 126 Cal.Rptr. 350 (1975); *People v. Middleton,* 54 N.Y.2d 42, 444 N.Y.S.2d 581, 429 N.E.2d 100 (1981); *People v. Milone,* 356 N.E.2d 1350, 43 Ill.App.3d 385, 2 Ill.Dec. 63 (1976); *Smith v. State,* 253 Ga. 536, 322 S.E.2d 492 (1984); *State*

New York have ruled that courts may judicially notice the general validity of bite mark evidence. *See* Gianelli and Imwinkelried, *Scientific Evidence* (1986), at page 381.

We agree with appellant that the field of forensic odontology is relatively new and that the experts in the field do not all agree on the exact number of similarities necessary to make a positive identification. However, as to the latter, we also find that it is not the number of similarities, but their quality which is most helpful. *See People v. Marx*, 54 Cal.App.3d 100, 126 Cal.Rptr. 350, 353 (1975). Notwithstanding that the reliability of bite mark evidence has not yet been universally accepted, see Wilkinson and Gerughty, "Bite Mark Evidence: Its Admissibility is Hard to Swallow," 12 *West.St.U.L.Rev.* 519, 560 (1985), we must disagree with appellant that bite mark evidence is accepted in the scientific community only as novel scientific evidence. In *Marx*, the California court pointed out that "[c]oncededly, there is no established science of identifying persons from bite marks as distinguished from, say, dental records and x-rays." (353). Thus, contrary to what is accepted about fingerprint evidence, that there are no two identical sets of fingerprints, in the field of forensic odontology, because there are over 2½ billion different possibilities in charting the human mouth, see Moenseens, Moses, and Inbau, *Scientific Evidence in Criminal Cases* (1973), this causes the conclusion that no two mouths will have identical characteristics to be reached. In any event, we find that bite mark evidence has received sufficient general acceptance by recognized experts in the field of forensic odontology that it is unnecessary for us to consider the applicability of the Frye test to this cause. *See Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), which provides that only when the techniques have gained general acceptance in the relevant scientific community should such expert testimony be

admissible. The lack of agreement on the minimum number of concordant points on similarity, as well as what might be considered as the lack of sufficient background data, goes to the weight and not the admissibility of such evidence.

Appellant's fourth point of error is overruled.

■ Appellant contends, in his fifth point of error, that he was wrongfully denied his right to counsel when he was forced to submit to the giving of his dental impressions. He relies upon the Sixth Amendment to the United States Constitution and Article One, Section Ten, of the Texas Constitution as his authority that he had the right to the assistance of counsel at that stage of the proceedings. We overrule his point of error.

The Supreme Court has held that the Sixth Amendment right to counsel attaches when the proceedings against the accused have reached a "critical stage." *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932). This critical stage has been held to be when formal charges have been lodged against the accused. *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). *See also McCambridge v. State*, 778 S.W.2d 70 (Tex.Cr.App. 1989), cert. denied —— U.S. ——, 110 S.Ct. 1936, 109 L.Ed.2d 299 (1990), which applies the same test as a matter of Texas constitutional law.

Here, appellant was compelled to submit to the taking of an impression of his teeth on May 4, 1983. He was not then formally charged or indicted for capital murder; that did not occur until November 21, 1983.

Appellant argues that since he was given statutory warnings by Cabaniss, a McLennan County Justice of the Peace, on April 7, 1983, formal adversarial proceeding had been initiated against him; therefore, he argues that the proceeding had reached that "critical stage." Appellant's argument fails because statutory warnings are

v. Asherman, 193 Conn. 695, 478 A.2d 227 (1984); *State v. Garrison,* 120 Ariz. 255, 585 P.2d 563 (1978); *State v. Green,* 305 N.C. 463, 290 S.E.2d 625 (1982); *State v. Howe,* 136 Vt. 53, 386 A.2d 1125 (1978); *State v. Jones,* 273 S.C. 723, 259 S.E.2d 120 (1979); *State v. Peoples,* 227 Kan. 127, 605 P.2d 135 (1980); *State v. Sager,* 600 S.W.2d 541 (Mo.Ct.App.1980) cert. denied 450 U.S. 910, 101 S.Ct. 1348, 67 L.Ed.2d 334 (1981).

not "formal charges" under the above test. *See McCambridge, id* at 74.

Therefore, appellant had no right to the assistance of counsel at the time when his dental impressions were taken from him. Appellant's fifth point of error is overruled.

■ Appellant's sixth point of error attacks the bite mark evidence on the ground that it was obtained in violation of his right to be secure from unreasonable searches and seizures under the Fourth Amendment to the United States Constitution and Article One, Section Nine, of the Texas Constitution, and Article 1.06, V.A.C.C.P.

Appellant raised this complaint in a pretrial motion to suppress the bite mark evidence. It is appellant's contention that the State should have been required to obtain a search warrant in order to seize his dental impressions. We are unable to agree with appellant. Appellant's sixth point of error is overruled.

In *Marquez,* supra, at 234, in addressing a similar contention, this Court recently stated the following:

> In *Patterson* (citation omitted), this Court held that there was no constitutional impediment, either as a search and seizure or concerning the privilege against self incrimination, preventing the taking of dental impressions from a criminal defendant. The court in *Patterson,* supra, likened dental casts to fingerprints for constitutional purposes. We hold this type of relatively unintrusive identification evidence to be seizable without constitutional implication.

This Court also held in *Patterson* that "to require the appellant to produce a mold of his teeth is not in violation of *any* constitutional protection. In *Olson v. State,* 484 S.W.2d 756 (Tex.Cr.App.1969), there was an extended discussion of the different kinds of physical evidence that are and are not within the protection of the Constitution. There we held handwriting exemplars to be compellable. We hold requiring a defen-

dant's teeth marks is likewise compellable." (862–863). (Emphasis supplied.)

We find that what this Court stated in *Patterson* and *Marquez* controls the disposition that we must make of appellant's point of error. It is overruled.

Appellant, in his second point of error [8], asserts that the trial court erred in refusing to admit a line of testimony that would have tended to incriminate Ronnie Breiten, henceforth Ronnie, in the "Lake Waco" murders. He argues that this evidence could have established reasonable doubt as to his guilt in this cause.

The record reflects that the trial court granted the State's motion in limine to exclude appellant's proferred evidence. The record also reflects that before appellant called any of his witnesses on this line of testimony, a hearing was held outside the presence of the jury to determine the admissibility of the evidence. During this hearing, one of appellant's witnesses, Catherine Breiten, Ronnie's stepmother, henceforth Breiten, testified outside the presence of the jury.

Breiten testified that Ronnie arrived at her home shortly before 6:30 a.m. on July 14, 1982, the morning after the "Lake Waco" murders occurred, to use her washer and dryer. She testified that she was doing a load of "whites" when Ronnie threw his dirty clothes, a T-shirt, blue jeans, and a pair of tennis shoes into the washer. This upset her greatly and she immediately removed these items from the washer. She testified that she noticed that there was dirt and blood on the clothes, which she testified were muddy, and blood on the tennis shoes.

Breiten testified that Ronnie told her that the night before he was "drinking and fishing" at Lake Waco, the scene of the murders. She also testified that Ronnie asked her if he could borrow his father's knife because he had lost his the night before.

---

8. Appellant's second point of error reads:
 The trial court erred in excluding testimony of defense witnesses tending to show the of-
 fense was committed by a person or persons other than appellant.

For reasons not necessary to state, Breiten became extremely agitated during cross examination and insisted that the questioning be halted until she had the opportunity to speak with an attorney. The trial judge allowed Breiten to cease testifying subject to being recalled the next day.

When Breiten was recalled the next morning, after she had spoken with an attorney, she recanted the testimony that she had previously given, claiming "it was a lie."

Appellant established through his proferred testimony of other witnesses a link between Ronnie and the convenience store in Waco where Montgomery cashed a check for $200 shortly before she was murdered. It appears that Ronnie's wife, Joyce Breiten, henceforth Joyce, was working in the store on the date of the murders and was aware that Montgomery had cashed her check and had received $200 in cash. Evidence was also elicited that established that Ronnie was in extreme financial difficulty during the summer of 1982, when the "Lake Waco" murders occurred.

Further proffered testimony connected Ronnie to James Bishop, henceforth Bishop, a resident of Waco in 1982 who moved from Texas in August, 1982 to California. While in California, Bishop committed a crime which was very similar to the murders of Kenneth, Montgomery and Rice.

The trial court subsequently ruled that the entire line of proffered testimony linking Ronnie with the "Lake Waco" murders was inadmissible evidence. Appellant contends that it was error to exclude this line of testimony from the jury. We disagree.

■ If Breiten had been called to testify before the jury, because she had recanted her entire testimony at the hearing held outside the jury's presence, and there is nothing in the record that might reflect or indicate that she would have reaffirmed the testimony she previously gave, appellant would have had to impeach her with her prior testimony.

The general rule that existed when appellant's trial occurred in 1984 was that a party could not impeach his or her own witness. An exception to this rule allowed a party to impeach his or her own witness by any means other than proof of the witness' bad character, but only when the testimony of that witness was injurious to the party's cause. *See* Art. 38.28, V.A.C.C.P. (repealed 1986)[9].

The exception that then existed required that the witness must have testified adversely on a material fact to the party who called him. The impeaching party also had to show that he placed the witness on the stand with the bona fide belief that the testimony would assist his defense and that he was surprised by the testimony which was in fact elicited. *See Morgan v. Stringer*, 120 Tex. 220, 36 S.W.2d 468 (1931); *Kilburn v. State*, 490 S.W.2d 551 (Tex.Cr. App.1973).

Appellant could not have benefitted from the above exception since he knew from the hearing held outside the jury's presence that Breiten had recanted her story and would not testify favorably to him. Thus, appellant could not have held a bona fide belief that Breiten's testimony would assist his defense, nor could he have shown surprise.[10] Furthermore, the policy behind the former rule was to prohibit a party from calling a witness that he knew would testify against him simply so as to bring in outside evidence with which to impeach the witness. *See Brown v. State*, 523 S.W.2d 238 (Tex.Cr.App.1975); *Hunnicutt v. State* 523 S.W.2d 244 (Tex.Cr.App.1975).

■ The general rule is that an accused may not bring in evidence that a third person may have had a motive to commit the crime with which the accused is charged. An exception exists if the ac-

---

**9.** Art. 38.28, V.A.C.C.P. provided:
A party may, when testimony of his own witness is injurious to his cause, attack the testimony in any other manner except by offering evidence of the witness' bad character.

**10.** This analysis only applies under the old rules of evidence. As of September 1, 1986 the rules have changed and a party is now allowed to impeach her or his own witness. See Rule 607, Tex.R.Crim.Evid.; *Beathard v. State,* 767 S.W.2d 423 (Tex.Cr.App.1989).

cused can link the third person to the crime. *See Williams v. State,* 643 S.W.2d 477, 483 (Tex.Cr.App.1982). In this instance, the exception cannot be invoked unless there is some evidence, other than that given and then recanted by Breiten, that connects Ronnie to the "Lake Waco" murders.

Disregarding Breiten's testimony, we find that all that remains is testimony that Ronnie may have known about the money that Montgomery had received from the convenience store and that he was in financial difficulty during the summer of 1986, when the "Lake Waco" murders occurred. This testimony would indeed establish a motive for Ronnie to commit the murders, but such does not tend to link him to the murders. Almost 100 years ago, this Court pointed out that

> [s]ome testimony must be offered showing opportunity on the part of such third person and testimony tending to show that such party may have committed the offense.

*Porch v. State,* 50 Tex.Cr.R. 335, 99 S.W. 102, 110 (Tex.Cr.App.1906).

 The additional testimony which connects Ronnie to Bishop does not, by virtue of the fact that Bishop was an unsavory character, link Ronnie to the murders, nor does it show that he had an opportunity to commit the murders, or support the conclusion that he might have committed the murders.

We hold that the trial court correctly excluded the proffered evidence that Ronnie may have committed the "Lake Waco" murders.[11]

Appellant's second point of error is overruled.

 Appellant claims in his third point of error [12] that the trial court erred by not allowing him to explain the law of circumstantial evidence to the members of the jury panel during voir dire examination. He asserts that this denied him the intelligent use of his peremptory strikes. *See* Art. 35.16(c)(2) and Art. 35.17, Subd. 2, V.A.C.C.P.

We find that appellant's point of error is based on an erroneous assumption. To support appellant's claim that he needed to be able to question prospective jurors on their ability to follow the former jury instruction on circumstantial evidence, it must at least be plausible that the jurors might actually have to follow that instruction.

In *Hankins v. State,* 646 S.W.2d 191 (Tex.Cr.App.1981), a majority of this Court held that direct and circumstantial evidence are both equally probative and that, even though the facts of a criminal case rest exclusively on circumstantial evidence, a special instruction to the jury on circumstantial evidence is no longer required.

The majority opinion stated that the policy behind eliminating the special circumstantial evidence charge was to eliminate confusion and to direct the jury to follow one standard: beyond a reasonable doubt. *Hankins, id.* at 199. We hold that in order to effectuate this policy, prospective jurors should not be questioned on voir dire about their ability to follow the former charge on circumstantial evidence.

Appellant's third point of error is overruled.

In appellant's seventh point of error [13], he attacks the admissibility of testimony from Daryl Beckham, henceforth Beckham, a State's witness. Beckham, who was appellant's cellmate in the McLennan County

---

11. This Court is aware that the objection made to this line of testimony, which was sustained by the trial court, was based on relevancy. Although it is not apparent that the trial judge followed the required analysis in reaching his ruling, that the testimony was irrelevant, his decision will be upheld by this court on any theory supported by the record, even if the record does not reflect or indicate that he did not rely on that theory. *See Dugard v. State,* 688 S.W.2d 524, 530 n. 2 (Tex.Cr.App.1985).

12. Appellant's third point of error reads:

The trial court erred in refusing defense counsel to adequately explain the law of circumstantial evidence.

13. Appellant's seventh point of error reads:

The trial court reversibly erred by failing to exclude the hypnotically enhanced or induced testimony of Daryl Beckham.

Jail, testified that appellant bragged to him not only that he had committed the "Lake Waco" murders, but also why and how he committed them. Prior to his testimony at appellant's trial, Beckham was hypnotized by Bob Prince, henceforth Prince, a Texas Ranger. This hypnotic session took place on February 15, 1983.

Appellant attacks the admission of Beckham's testimony on three grounds. First, he claims that testimony from a witness who has been hypnotized is inadmissible because hypnosis, as a procedure for memory recall, fails to meet the *Frye* test. *Frye v. U.S.*, supra. Appellant also attacks Beckham's testimony on the ground that it denied him the right to effective cross examination guaranteed by the Sixth and Fourteenth amendments to the United States Constitution, and Article 1, Section 9, of the Texas Constitution. Appellant's seventh ground is also based on his right to due process of law under the Fifth and Fourteenth amendments to the United States Constitution, and Article 1, Section 10 of the Texas Constitution. We will overrule his contentions.

 In *Zani v. State*, 758 S.W.2d 233 (Tex.Cr.App.1988), which was decided after appellant's trial, a majority of this Court declined to adopt an exclusionary rule prohibiting the use of hypnotic recall in every case. *Zani* at 234. The majority opinion held that,

> [i]f, after consideration of the totality of the circumstances, the trial court should find by clear and convincing evidence that the hypnosis neither rendered the witnesses' posthypnotic memory untrustworthy nor substantially impaired the ability of the opponent fairly to test the witness's recall by cross examination, he may admit the testimony.

*Zani*, at 244.

To aid trial courts of this state in making that determination, the *Zani* majority opinion set out the dangers of hypnosis of which the trial courts should be aware. These are: hypersuggestibility of the hypnotic subject; loss of critical judgment on the part of the hypnotic subject; confabulation by the hypnotic subject; and memory cementing in the hypnotic subject. The *Zani* majority opinion also provided several factors for trial courts to consider in making the determination whether the testimony is trustworthy. These include: the level of training of the hypnotist; the hypnotist's independence from law enforcement investigators, the prosecution and the defense; the record of what the hypnotic subject knew before the session; the recordings of the contact between the hypnotist and his subject; the presence of persons other than the hypnotist and his subject during the hypnotic session; the location of the hypnotic session; the appropriateness of induction and memory retrieval techniques; the appropriateness of the use of hypnosis for the type of memory loss involved; the existence of any evidence tending to corroborate the testimony of the hypnotized witness; and the possibility of the suggestion of an answer during the hypnotic session.

We will assume for purposes of argument, that the trial judge in this cause was aware of the dangers inherent in hypnosis and most of the factors that this Court set out in *Zani* to determine the trustworthiness of hypnotically recalled testimony when he made his decision to admit the hypnotically enhanced testimony of Beckham. The trial judge also had knowledge of the expertise of the hypnotist who conducted the session, and of what occurred during the session. After hearing all of the testimony and, presumably, taking the dangers of hypnosis into account, the trial judge overruled appellant's motion to exclude Beckham's testimony.

We find that the procedures utilized by the trial judge in this cause conformed substantially with those set out in *Zani*. The jurors were free to attach whatever weight they felt was appropriate to Beckham's hypnotic testimony.

 Appellant also challenges the admission of Beckham's testimony on the ground that it denied him due process of law under the Fifth and Fourteenth Amendments to the U.S. Constitution and Article 1, Section 19, of the Texas Constitution.

Appellant does not, however, explain how he was denied due process of law. He only argues that hypnosis is an unduly suggestive procedure. The only recognized violation of due process of law in this area occurs when a witness makes an in court identification after undergoing hypnosis in order to restore his memory. The testimony is only excluded if the totality of the circumstances surrounding the pretrial identification demonstrates a violation of due process of law. *See Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967); *Vester v. State*, 713 S.W.2d 920 (Tex.Cr.App.1986).

This case, however, does not involve testimony by a State's witness as to the identification of the perpetrator of the "Lake Waco" murders.

■ Appellant's third and last ground of attack on the admissibility of Beckham's testimony is based on his claim that it violated his right to effectively confront Beckham. U.S. Const. amend. 6; Tex. Const. art. 1, sec. 10. Appellant claims that, due to the hypnosis, Beckham's recollection of what was said to him by appellant had become cemented in his mind. Appellant argues that this would have the effect of making Beckham more certain of the veracity of his statements than if he had not been hypnotized and would, thereby, rob appellant's cross examination of one of its most useful purposes: exposing doubt or indecision in the witness' testimony.

This issue has been addressed by the Fifth Circuit in *U.S. v. Valdez*, 722 F.2d 1196 (5th Cir.1984). There, that court stated:

Indeed, in a criminal trial, the witness's resultant undue confidence might violate the defendant's constitutional right to confront and cross-examine the witness in any meaningful way. What is more, the jury may be so influenced its suppositions concerning the process of hypnosis that revelation of the fact that a witness's testimony was influenced by hyp-

nosis may give it even greater credence in the jury's eyes. The jury's assumptions concerning the nature of memory and the accuracy of hypnosis may make the testimony so prejudicial that its weight is impossible to overcome.

*Id.* at 1202.

The Fifth Circuit again addressed the issue in *Wicker v. McCotter*, 783 F.2d 487 (5th Cir.1986), cert. denied 478 U.S. 1010, 106 S.Ct. 3310, 92 L.Ed.2d 723 (1986). The court opined that

[u]nder some circumstances, hypnosis may render a witness so positive, so certain, that effective cross-examination is impossible. The record in this case, however, demonstrates that [the] hypnosis did not have that effect.

*Id.* at 493.

In *Zani*, this Court stated, albeit in dictum, that hypnotic testimony may be vulnerable to an attack based on the denial of the effect hypnosis has of cementing images and thoughts in the subject's mind. *Zani v. State*, 758 S.W.2d at 241 n. 8 (Tex. Cr.App.1988).

In *U.S. v. Owens*, 484 U.S. 554, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988), the Supreme Court addressed the issue of whether a confrontation clause violation can be founded upon a witness's loss of memory. The Court held that even if a witness had identified the defendant as the perpetrator of the crime before trial but could not remember at trial whether the defendant was the perpetrator, this did not violate the confrontation clause. We find that situation is analogous to the one presented here. Even if the witness can remember something at trial which he could not recall before trial, the opposing party may be able to elicit that fact on cross examination.

Appellant's seventh point of error is overruled.

In his eighth point of error [14] appellant contends that the jury should have been instructed to disregard the testimony of Jennings, a witness who was incarcerated

---

**14.** Appellant's eighth point of error reads: The trial court reversibly erred by failing to exclude the testimony of incarcerated witness,

Jerry Jennings.

in the McLennan County Jail with appellant at the time of his trial. The record reflects that prior to trial appellant filed a motion for discovery for disclosure of impeaching evidence. In his memorandum of law in support of his motion, appellant cited case law which supported his proposition that exculpatory evidence includes evidence of consideration or reward given by the State in exchange for a witness' testimony. In this instance, the State claimed that no such exculpatory evidence existed.

Appellant maintains that during the trial Jennings revealed that he knew that he would receive from the State some sort of assistance or reward for services rendered if he would testify against appellant. We disagree with appellant's rendition of the facts.

Appellant bases his contention on the fact that Jennings testified that he wrote down everything that appellant said to him after he said it, and turned this information over to State agents. Appellant also relies on the testimony of Kevin Mikel and James Jordan, who were also incarcerated in the McLennan County Jail with appellant.

We find that the testimony which appellant directs us to only shows that *appellant himself* was cooperating with the investigators because he felt that it would work to his benefit. The evidence does not show that Jennings had any knowledge or expectation of any type of assistance or reward that he might receive in exchange for his testimony against appellant. Appellant's eighth point of error is overruled.

■ In a supplemental brief, appellant seeks to use testimony adduced at the remand hearing which this Court ordered, in order to support an already presented point of error or to raise new points of error. As previously pointed out, this Court remanded this cause to the trial court *only* so that appellant could make an offer of proof on

his claim that he was forced to undergo preindictment delay which substantially impaired his defense. We overrule all of appellant's points of error set out in his supplemental brief.

At the hearing, appellant sought to introduce evidence applicable to his claim that the above incarcerated witnesses were offered rewards or assistance on their sentences in exchange for their testimony against him. The State objected on the ground that this evidence was irrelevant to the subject of the proceeding. The trial judge sustained the State's objections but allowed a "bill on the bill."

We find that the trial judge was correct in ruling that all of the above evidence was irrelevant to the hearing that this Court ordered. This Court did not order the hearing so that appellant could have a second chance to support his points on appeal; it was granted for the limited purpose of allowing him to make an offer of proof on one of his points of error that had previously been presented. *See ante.* We refuse to consider any testimony from the hearing other than that which supports appellant's point of error upon which the hearing was granted, which we have already considered and overruled.

Appellant's ninth and tenth points of error [15] center on the testimony of Kader, a witness for the State at the punishment phase of appellant's trial.

Kader testified that in August of 1982, when she was 17 years old, she went on a double date with appellant, her friend Faye Pearson, and Pearson's boyfriend, Robert Coleman. According to Kader's testimony, the four of them, upon appellant's invitation, went to his residence to drink beer. While at appellant's residence, Kader's friends went into another room and left her alone on a couch with appellant.

---

**15.** Appellant's ninth and tenth points of error read:

The trial court erred in admitting the testimony of Lisa Kader based on the fact that the prosecution did not prove the elements of rape as per the *Texas Penal Code,* Section 21.02 and therefore the testimony was not admissible as evidence of a prior bad act and

served only to improperly inflame the jury and prejudice appellant.

The trial court erred by admitting Lisa Kader's testimony of alleged rape, by appellant David Spence, because they failed to prove elements of rape due to a lack of corroborative evidence in a case where there was belated outcry.

During the time in which Kader's friends were not present, appellant told Kader that she should be good to "Chilly," a name by which appellant insisted that he be called, and that if she was good to "Chilly," "Chilly" would be good to her. Appellant then became very sexually aggressive with Kader. He pulled her shirt up, and put his hands down her pants and between her legs. He bit her several times on her breasts and shoulders. Kader managed to get away from appellant and went into the bedroom where her friends were to tell them that appellant was "acting strange." Her friends were preoccupied at the time and told her that they would join her soon. Kader returned to where appellant was situated. When Kader's friends came out of the bedroom they immediately left the residence to go buy a "joint" of marijuana. Kader was again left alone with appellant.

During the time that appellant and Kader were alone, appellant held a steak knife on Kader, rubbing the knife's point against her breasts and stomach. Kader testified that she was scared and crying. She testified that she did not resist because she "wanted to play [her] cards right," and get out of appellant's residence alive, because she feared appellant was going to kill her.

Appellant forced Kader to perform fellatio on him and to copulate with him. During this sexual activity, appellant bit Kader several more times; once on one of her nipples, a bite which left a mark that did not disappear for two weeks. While having sexual intercourse with Kader, appellant rolled off of Kader and masturbated until he had ejaculated.

Kader testified that she hurriedly dressed when appellant allowed her to get up. As soon as Pearson and Coleman returned to appellant's residence they all left in appellant's automobile. According to Kader's testimony, while driving them around, appellant stated, to no one in particular, that he didn't want to take Kader home. However, when Coleman insisted that appellant take Kader home, appellant capitulated.

That night Kader told Pearson what appellant had done to her when she and Coleman were absent. Kader told Pearson that she made a conscious decision not to press charges against appellant because she was afraid that he might harm her if she did.

Appellant contends that the admission of Kader's testimony violated his rights to due process of law under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. Specifically, appellant argues that the rape of Kader was inadmissible evidence because the State could not prove all the elements of rape and, therefore, no rape was committed by him.

■■■ There is, however, no requirement in our law that all of the statutory elements of an offense must be proven before a prior unadjudicated extraneous offense may be admitted at the punishment phase of a capital murder trial. Absent a showing of surprise, proof of an unadjudicated extraneous offense is admissible. *See Garcia v. State*, 581 S.W.2d 168 (Tex. Cr.App.1979) (Roberts, J. concurring opinion). To show that the admission of a prior unadjudicated extraneous offense violated a capital murder defendant's due process of law, we have held that such a defendant must show that he was unfairly surprised by the testimonial evidence. *Williams v. State*, 622 S.W.2d 116 (Tex.Cr.App.1981), cert. denied 455 U.S. 1008, 102 S.Ct. 1646, 71 L.Ed.2d 876 (1982). We find that appellant makes no claim of surprise in his brief and we can find no evidence of his being surprised in the record.

Article 37.071(a) of the Code of Criminal procedure expressly provides that all relevant evidence may be admitted at the punishment phase of a capital murder trial. This encompasses evidence of unadjudicated extraneous offenses. *See Quinones v. State*, 592 S.W.2d 933 (Tex.Cr.App.1980), cert. denied 449 U.S. 893, 101 S.Ct. 256, 66 L.Ed.2d 121 (1980).

Appellant's ninth point of error is overruled.

■■ Appellant contends in his tenth point of error that Kader's testimony must have been corroborated in order to be admissible. We find that our above disposition of appellant's ninth point of error also

disposes of this point of error. Furthermore, Kader testified that after she went home on the evening after she had been raped by appellant she told Pearson what appellant had done to her. This is sufficient to show an immediate outcry, so corroboration would not have been required in any event. *See Wright v. State*, 364 S.W.2d 384 (Tex.Cr.App.1963).

Appellant's tenth point of error is overruled.

Two points of error challenge the admissibility of psychiatric examination testimony by Joliff, a State's witness, which was admitted at the punishment phase of appellant's trial [16]. Appellant asserts on appeal that Joliff's psychiatric examination that was administered on April 7, 1983, was conducted in violation of his Fifth and Sixth Amendment rights. Specifically, appellant argues that prior to the psychiatric examination by Joliff, neither Joliff nor anyone else warned him that he was suspected of committing the offense of capital murder. Appellant further argues that he was not informed of his right to consult with an attorney prior to the psychiatric examination by Joliff. *See Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) (Held, Fifth Amendment of the United States Constitution requires that defendants be told before submitting to psychiatric examination that they have a right to be silent and that anything they say could be used against them at the punishment phase of their trial).

The State responds by arguing that since the psychiatric examination was performed by Joliff at the appellant's request he waived his right to counsel. Alternatively, the State argues that if there is error in failing to warn appellant of his right to counsel, it is harmless. The State bases its harmless error contention on the fact that appellant was warned of his rights by Ca-

baniss, a McLennan County Justice of the Peace, on April 7, 1983.

■■■ We decline to reach the issue of whether appellant should have been afforded the opportunity to consult with his attorney prior to the psychiatric examination by Joliff which he himself requested, because we find that appellant's eleventh point of error was not properly preserved for appellate review, and thus has been waived. Rule 52(a), of the Texas Rules of Appellate Procedure, provides: "In order to preserve a complaint for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling he desired the court to make if the specific grounds were not apparent from the contest." The rationale for this rule is to require the parties to give the trial judge and opposing counsel notice of the error which allegedly is being committed. This affords the trial judge and opposing counsel the opportunity to rectify the error, if possible. *See and compare Zillender v. State*, 557 S.W.2d 515 (Tex.Cr.App.1977).

In the case before us the record reflects that Russell D. Hunt, co-counsel for appellant, outside the presence of the jury and prior to the punishment phase of the trial, presented a motion in limine requesting the trial judge to exclude any evidence concerning appellant's psychiatric condition. The motion was granted. The defense then objected to the testimony of Jolliff. The following exchange took place:

> Mr. Hunt (co-counsel for appellant): At this time, we would make a motion to exclude the testimony of Dr. Jolliff, based on the fact *that his name does not appear on the subpoena list, and based on the fact that we were told that Dr. Jolliff was not going to testify.* We would ask the court to exclude his testimony. (Emphasis supplied.)
>
> The Court: All right, sir. I overrule the motion.

**16.** Appellant's eleventh and twelfth points of error, respectively, read:

The trial court reversibly erred by overruling appellant's objection to the admission of psychiatric testimony when there is no opportunity to consult with counsel about participation in the psychiatric examination.

The trial court reversibly erred by overruling appellant's objection to the admission of psychiatric testimony which had not been preceded by the warning that testimony based on the examination could be used at the punishment stage of the trial.

Mr. Fuller (co-counsel for appellant): Your honor, I would object to the court's *ruling,* on the basis that it denies the defendant effective assistance of counsel and due process. (emphasis added).

The Court: All right, sir. I overrule it.

After the court overruled appellant's motion, Jolliff testified outside the presence of the jury. The State asked Jolliff numerous questions about the warnings that he had given appellant prior to the examination. This questioning elicited the fact that Jolliff did read appellant his legal rights before conducting the psychiatric examination. The State also introduced evidence that appellant received his statutory legal warnings, including the right not to speak with a psychiatrist, from a Justice of the Peace, just prior to his psychiatric interview with Jolliff.

The record also reflects that during his cross examination of Jolliff, appellant's counsel focused on when Jolliff was informed that he would be testifying; in what capacity Jolliff was acting during his examination of appellant; whether he was aware of the fact that the examination was being monitored by police investigators; and what the basis for his opinion was. Counsel never inquired into which warnings were given to appellant; whether he was informed of his right to counsel; nor whether appellant signed any kind of waiver of his rights. All of the foregoing questions would have been pertinent to establish a violation of appellant's Fifth and Sixth Amendments rights under *Estelle v. Smith,* yet were not asked by appellant's counsel. Indeed, it was the trial judge himself who tried to further ascertain whether the warnings by Jolliff were sufficient.

The Court: And what did you warn him?

Dr. Jolliff: [I] said, 'I need to tell you first thing, that anything you say may be used against you in a court of law.'

The Court: And did he appear to understand what you had told him?

Dr. Jolliff: Yes.

The Court: And did you tell him that he was entitled to an attorney to be present at that time?

Dr. Jolliff: I was unaware of that. I did not tell him.

\* \* \* \* \* \*

The Court: And, Doctor, after you told Mr. Spence that any statement that he made could and probably would be used against him in any criminal trial, then did he voluntarily go ahead and talk to you?

Dr. Jolliff: Immediately, quite pleasantly and cooperative (sic).

Appellant's attorneys, however, never asked Jolliff any questions about the warnings that Jolliff gave appellant nor did they make any new or further objections; thereafter Jolliff was temporarily excused from the witness chair.

Before Jolliff was recalled before the jury, appellant's counsel, outside the presence of the jury, reurged the objections that they had previously made. The court again overruled the objections. Appellant then requested a running bill of exceptions be granted on all the previously stated bases for objection. The trial judge granted appellant's request.

The record reflects that, previous to Jolliff's testimony before the jury, Hunt, one of appellant's attorneys, stated the following:

> Your Honor, prior to the calling of [Jolliff], I would like to make it clear to the jury and to the Court, that I am again requesting that the Court take judicial knowledge of all of the objections that we made yesterday in chambers to the testimony of Dr. Jolliff, and ask that the Court would give me a running bill of exception, or a running bill on those matters, so that I don't have to interrupt every question and every response of this witness in order to properly object to that. I would ask the Court to do that.

The Court: All right. And I grant it.

Jolliff was recalled and testified in the jury's presence without further objection by defense counsel.

It is clear from the record that appellant's objections were directed toward the State's failure to place Jolliff on the State's subpoena list. Appellant argued to the trial judge that this resulted in inadequate notice to appellant, ineffective assistance of counsel, and deprivation of the constitution-

al right of due process. Appellant's complaint on appeal is based not on the notion that the lack of notice to his trial counsel denied him effective assistance of counsel, but that his right to counsel before consenting to the psychiatric examination was denied.

This Court has held that, "if an objection made in the trial court differs from the complaint made on appeal, a defendant has not preserved any error for review." *Burdine v. State*, 719 S.W.2d 309, 319 (Tex.Cr. App.1986), cert. denied 480 U.S. 940, 107 S.Ct. 1590, 94 L.Ed.2d 779 (1987). This Court, however, has recognized exceptions to the general rule and has allowed a party to complain on appeal of the overruling of a general objection or *imprecise specific objection* if it is of the sort that the trial judge and opposing counsel could have clearly understood the true basis of the objection. *Zillender v. State*, supra.

However, we find that this is not a case of an imprecise specific objection where the correct ground of exclusion should have been obvious to the trial judge and opposing counsel. Here, appellant's objection at trial, when read in context, is very specific and precise: that appellant did not receive adequate notice that Jolliff was going to testify at trial, because Jolliff's name was not listed on the State's subpoena list, and that this denied appellant effective assistance of counsel. Appellant does not really complain about the fact that his attorney's were told that Jolliff was not going to testify, and instead did testify. We hold that simply because appellant's trial attorneys mentioned effective assistance of counsel and the constitutional right to due process of law does not mean that the trial judge should have understood the objection to encompass the Fifth or Sixth Amendment right to counsel under *Estelle v. Smith.*

Thus, we do not read appellant's trial court objection as raising the issue that he presents on appeal. Therefore, nothing is presented for review. Appellant's eleventh and twelfth points of error are overruled.

Appellant argues under his thirteenth point of error[17] that the State's psychiatrist, Dr. Clay Griffith, who testified at the punishment phase of the trial, see Art. 37.071(b)(2), V.A.C.C.P., should not have been permitted to testify because the record shows Griffith did not personally interview appellant. However, that is not a necessary prerequisite under our law to one giving his expert opinion. *See Barefoot v. Estelle*, 463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983).

Appellant also argues that Griffith was so biased as a witness for the State that he would never change his opinion of appellant's future dangerousness, no matter what favorable information might be presented to him. Appellant contends that admitting Griffith's testimony violated appellant's due process rights under the Fifth and Fourteenth Amendments to the United States Constitution.

The record reflects that Griffith was presented with a hypothetical question which set forth the facts surrounding the instant offense and those bad acts which had been admitted into evidence as having been committed by appellant. After listening to the hypothetical question, Griffith testified that it was his opinion that appellant was an "antisocial personality" who was incapable of being rehabilitated. He further testified that appellant would constitute a future danger to society.

On cross examination, appellant's counsel changed the hypothetical upon which Griffith's opinion was based, eliminating many of the sordid facts of the "Lake Waco" murders and the other extraneous offenses which were introduced against appellant at the punishment phase of his trial. Griffith's opinion, despite the dilution of the facts, never changed. Appellant contends that his attorney's cross examination established that Griffith is a biased witness who would always find that anyone who has been convicted of capital murder is a future danger to society.

---

17. Appellant's thirteenth point of error reads: The trial court erred in admitting Dr. Clay Griffith's testimony at the sentencing phase of trial, over defendant's objection as his testimony violated defendant's Due Process of Law rights under the Fifth and Fourteenth Amendments.

Appellant is correct in pointing to his attorney's cross examination of Griffith to establish that Griffith may have been biased for the State. It is for this very reason, however, that his point of error must be overruled. It is the jury's province to determine the credibility of witnesses, which includes the State's expert witnesses, and the weight which their testimony deserves. Appellant's counsel's cross examination of Griffith was sufficient to attack Griffith's credibility. The jurors were free to weigh Griffith's testimony and give it whatever weight they thought that it deserved.

Appellant's thirteenth point of error is overruled.

Therefore, having overruled all of appellant's points of error, that are properly before this Court, we affirm the trial court's judgment of conviction and sentence of death.

CLINTON, J., concurs in result.