AFFIRM; Opinion issued November 14, 2012.



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-11-00605-CR

## DAVID CESAR CORONADO, Appellant

### V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 265th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F10-01245-R**

# OPINION

Before Justices Bridges, Richter, and Lang
Opinion By Justice Richter

A jury convicted appellant of injury to a child, made a deadly weapon finding, and sentenced him to life imprisonment and a $10,000 fine. In a single issue on appeal, appellant asserts the trial court erred in denying his motion to exclude the testimony of the State's bite mark expert. Finding no reversible error, we affirm the trial court's judgment.

## BACKGROUND

On December 17, 2008, appellant brought his five-month-old son to the emergency room with multiple traumatic injuries. The family reported that the child had simply stopped breathing while appellant was feeding him. Although the child had no heart rate and had

stopped breathing, he was resuscitated.

The child had severe head and neck injuries, including hemorrhaging and tissue swelling on his brain. He also suffered retinal hemorrhaging. The ligaments supporting the child's upper neck were torn, detaching the base of the skull from the spine. In addition to the head and neck injuries, the child had approximately forty broken bones in his shoulders, arms, hands, legs, and feet. He also had bruising and swelling on his head, face, hands, and feet, and bruising and bite marks on his elbows and knees.

Appellant, the child's father, told the police that he was alone in the bedroom with the child when he stopped breathing. Ruthy, the mother of the child, and Joe, Ruthy's father, were elsewhere in the home.

Dr. Matthew Cox testified at trial that the child's neck injury was the worst he had ever seen in an infant, and could only have been caused by a severe whiplash event that would have caused the child to immediately stop moving and breathing. Dr. Cox opined that the head and neck injuries were caused by a violent shaking, and the child's serious bodily injury was intentionally inflicted. He also opined that the injury was caused by whomever was alone with the child at the time the injury occurred.

Dr. Robert Williams, a practicing dentist and board-certified odontologist analyzed the bite mark evidence in the case. As a result of his analysis, Dr. Williams eliminated Ruthy and Joe as persons who could have inflicted the bite marks, but could not exclude appellant. Prior to trial, appellant moved to exclude Dr. Williams's testimony, alleging that forensic dentistry does not meet the requisite guidelines for the admission of scientific expert

testimony. After conducting a hearing on appellant's motion, the trial court ruled that the testimony was admissible.

Dr. Williams was among the witnesses who testified at trial. Upon conclusion of the trial, the jury found appellant guilty of injury to a child, made an affirmative deadly weapon finding, and sentenced him to life imprisonment and a $10,000 fine.

## ANALYSIS

In his sole issue on appeal, appellant contends the bite-mark evidence admitted at trial through the testimony of Dr. Williams is not reliable scientific evidence under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 584–87 (1993), and *Kelly v. State,* 824 S.W.2d 568, 573 (Tex. Crim. App. 1992). Specifically, appellant contends he established the scientific theory is questionable because reports from the National Research Council of the National Academies and others have concluded that serious deficiencies exist in the area of forensic dentistry. *See generally* National Research Council of the National Academies, *Strengthening Forensic Science in the United States: A Path Forward* 173–176 (2009) [hereinafter *NAS Report*]. The State responds that the trial court did not abuse its discretion in denying the motion to exclude Dr. Williams's testimony because the record reflects that Dr. Williams followed scientifically grounded and professionally accepted techniques in collecting and analyzing the bite mark evidence in this case.

We review a trial court's ruling on the admissibility of expert testimony for an abuse of discretion. *Layton v. State,* 280 S.W.3d 235, 240 (Tex. Crim. App. 2009); *Weatherred v. State,* 15 S.W.3d 540, 542 (Tex. Crim. App. 2000). Such rulings will rarely be disturbed by

an appellate court. *Vela v. State*, 209 S.W.3d 128, 136 (Tex. Crim. App. 2006); *Rodgers v. State*, 205 S.W.3d 525, 527–28 n. 9 (Tex. Crim. App. 2006). As with other types of evidentiary rulings, we will uphold the trial court's decision unless it lies outside the zone of reasonable disagreement. *Layton*, 280 S.W.3d at 240 (citing *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990) (op. on reh'g)). If the record supports the trial court's decision on the admission of evidence, there is no abuse of discretion. *Osbourn v. State*, 92 S.W.3d 531, 537 (Tex. Crim. App. 2002).

Rule 702 of the Texas Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

TEX. R. EVID. 702. It is a trial court's responsibility under Rule 702 to determine whether proffered scientific evidence is sufficiently reliable and relevant to assist the jury. *Jackson v. State*, 17 S.W.3d 664, 670 (Tex. Crim. App. 2000). Thus, before admitting expert testimony, the trial court must be satisfied three conditions are met: (1) the witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is appropriate for expert testimony; and (3) admitting the expert testimony will actually assist the fact finder in deciding the case. *Vela*, 209 S.W.3d at 131; *Jackson*, 17 S.W.3d at 670. These conditions are commonly referred to as (1) qualification, (2) reliability, and (3) relevance. *Vela*, 209 S.W.3d at 131. The focus of the reliability analysis is to determine whether the evidence has its basis in sound scientific

methodology such that testimony about "junk science" is weeded out. *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011). Reliability centers on principles and methodology rather than the conclusions an expert generates by using those principles or methodology.[1] *See Daubert*, 509 U.S. at 595. Although an inquiry as to reliability is flexible, the proponent of the evidence must establish some foundation for the reliability of an expert's opinion. *Vela*, 209 S.W.3d at 134. The demonstration of reliability must be made by clear and convincing evidence. *Russeau v. State*, 171 S.W.3d 871, 881 (Tex. Crim. App. 2005).

To be considered sufficiently reliable as to be of help to a jury, scientific evidence must meet three criteria: (1) the underlying scientific theory must be valid; (2) the technique applying the theory must be valid; and (3) the technique must have been properly applied on the occasion in question. *Vela*, 209 S.W.3d at 134; *Kelly*, 824 S.W.2d at 573. Generally, in areas considered "hard science," factors that could affect a trial court's determination of reliability include, but are not limited to: (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such a community can be ascertained; (2) the qualifications of the expert testifying; (3) the existence of literature supporting or rejecting the underlying scientific theory and technique; (4) the potential rate of error of the technique; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying scientific theory and technique can be explained to the court; and (7) the experience and skill of the person(s)

---

[1] Although appellant now also references the relevance of Dr. Williams's testimony, the challenge in the court below was made only as to reliability. Our inquiry is limited accordingly. *See* TEX. R. APP. P. 33.1(a).

who applied the technique on the occasion in question. *See Kelly*, 824 S.W.2d at 573. But the court of criminal appeals has recognized that the "assessment of a 'theory' or 'technique' in fields aside from the hard sciences, such as the social sciences or fields that are based primarily on experience or training . . . may be misleading." *See Nenno v. State*, 970 S.W.2d 549, 561 (Tex. Crim. App. 1998), *overruled on other grounds by State v. Terrazas*, 4 S.W.3d 720 (Tex. Crim. App. 1999). As a result, the court crafted "an appropriately tailored translation of the *Kelly* test to areas outside of hard science." *Id.* Although the general principles in *Kelly* still apply, the specific factors may or may not apply depending upon the context. *See Coble v. State*, 330 S.W.3d 253, 273 (Tex. Crim. App. 2010). This is because the methods of proving reliability in the soft sciences will vary, depending upon the field of expertise. *Id.* Consequently, to establish reliability in a "soft science," the proponent must establish that: (1) the field of expertise is a legitimate one; (2) the subject matter of the expert's testimony is within the scope of that field; and (3) the expert's testimony properly relies on or utilizes the principles involved in that field. *Nenno*, 970 S.W.2d at 561; *Tillman*, 354 S.W.3d at 435–36. Because the distinction between various types of testimony may often be blurred, the court of criminal appeals "explicitly refrained from developing rigid distinctions between 'hard' science, 'soft' sciences, and nonscientific testimony." *Morris v. State*, 361 S.W.3d 649, 655 (Tex. Crim. App. 2011).

Dr. Williams testified that forensic odontology is the application of the science of dentistry to the field of law. The NAS Report describes the science as an "experience-based forensic method based on expert interpretation of observed patterns." *See NAS Report, supra*

p. 174. Therefore, because the science is more akin to a soft science, we employ the *Nenno* factors in our analysis.

Dr. Williams testified that he is a practicing dentist and board-certified odontologist, and has been performing bite mark analysis for twenty years. He served on the board of directors for the American Board of Forensic Odontology ("ABFO") for six years, and worked with the certification committee to develop guidelines for becoming board certified in forensic odontology. He teaches at Baylor College of Dentistry, the University of Texas, Southern Methodist University, and Texas A & M University, and has written several papers and given numerous presentations in the field of forensic odontology. He works on a consulting basis with the Dallas County Medical Examiner's office and has been their chief forensic odontologist since 1991. He has also consulted with the FBI and various other law enforcement agencies across the state.

Dr. Williams testified that the field of forensic odontology is accepted as valid by the American Academy of Forensic Sciences, the American Dental Association, the Texas Dental Association, and many other scientific organizations that are involved with dentistry. There is also extensive literature supporting the scientific theory and underlying techniques of bite mark analysis, including a text book written by Robert Dorion entitled "Bitemark Evidence" and articles written by Charles Bowers, David Sweet, and David Sin. Dr. Williams acknowledged that there is a lack of scientific studies testing the reliability of bite marks on human skin, likely due to the fact that few people are willing to submit to such a study. However, he did point out there was one study on skin analysis conducted by Dr.

Gerald Reynolds using pig skin, "the next best thing to human skin." Dr. Williams testified that there are recognizable and definable techniques in the field of forensic odontology that can be verified. Specifically, the ABFO has established guidelines for the proper collection, documentation, and analysis of bite mark evidence. These guidelines provide a basic framework in which the scientific principles of forensic odontology are analyzed and applied, but they still allow for some discretion among practitioners. The techniques applied by a practitioner can be verified by examining their documentation of the analysis performed to ensure that no error, distortion or discrepancy was introduced into the comparison. Dr. Williams stated that he regularly has his work verified by the two other dentists within his practice by submitting the evidence to them and having them perform a blind analysis. He stated there are approximately 104 board-certified forensic odontologists available to verify another practitioner's analysis.

Dr. Williams described generally how bite mark evidence is collected and analyzed according to the ABFO guidelines. He testified that an odontologist should be contacted as soon as a bite mark is discovered because it is ideal that the evidence on the victim be as recent as possible. The odontologist should photograph the pattern injury and, if possible, take a saliva swab for DNA testing. An odontologist can take an impression of the skin where the suspected bite mark is located if it is lacerated or depressed, but Dr. Williams testified that he does not find such impressions to be of much evidentiary value. The next step would be to gather evidence from any suspects in the case, such as photographs, impressions, and casts of the suspects' teeth. Once the evidence is collected, the odontologist

–8–

analyzes the pattern injury on the victim to determine whether it has enough characteristics to be classified as a human bite mark. Dr. Williams explained that if the bruising is diffuse, the injury may not have evidentiary value. If a human bite mark is identified, the odontologist then determines whether there are enough unique characteristics of the teeth to pick the particular person out of a population. Dr. Williams was not willing to quantify the number of teeth needed to make a positive identification on any given bite mark other than saying "more than one." He explained that the more teeth that are "evidentiary" in the bite mark, the more accurate a statement an odontologist can make as to whether it is a human bite mark and whether there is a particular individual that can be associated with that bite mark. The ABFO guidelines provide a variety of methods that odontologists can utilize in comparing the cast of a suspect to a bite mark. Of these approved methods, Dr. Williams uses Adobe Photoshop to conduct his analysis. He scans the dental casts of any suspects and photographs of the bite marks onto his computer and sizes them "one to one" so they can be properly compared. He uses Adobe Photoshop to remove the superfluous material of the cast so that all that is left are the edges of the teeth that make contact with the tissue. This image is then converted to a transparent overlay which can be superimposed over the bite marks for comparison. Dr. Williams began using Adobe Photoshop in 1993 and worked with the forensic photographer for the Dallas County Medical Examiner's Officer to develop and refine this technique for bite mark comparison.

Dr. Williams acknowledged he was aware of recent cases and studies questioning the accuracy of bite mark analysis. He explained that these studies and cases simply highlight the fact that practitioner error, lack of training and/or a misapplication of recognized odontology techniques can yield results that are not evidentiary and should not be used in the judicial arena. Dr. Williams stated that he does not agree with the NAS Report's conclusion that bite mark analysis cannot result in a conclusive match. He explained that the ability to find a match depends on the quality of the evidence available for analysis and the quality of the evidence obtained from a suspect for comparison, and " the NAS does not like to see such a subjective analysis." Although he acknowledged that skin does not always make a good impression material, he also stated that you do not have to be a "rocket scientist" to see that, in some cases, there is a unique and distinct pattern of teeth that can be identified.

Dr. Williams testified about the steps he took in performing the bite mark analysis in this case. Dr. Williams was contacted by the State the day the child was brought to the hospital. Shortly thereafter, he went to the hospital and took photographs of the injuries. He was unable to collect a saliva sample for DNA testing because the child had already been cleaned up by the hospital personnel. The child had several pattern injuries that were suspected to be bite marks, but not all had sufficient evidentiary value to facilitate comparison. Dr. Williams identified three or more as being consistent with a human bite mark and then limited his analysis to two of the bite marks, one on the left knee and one on the lower right leg, just below the knee.

Subsequently, the three individuals who had access to the victim during the time the injuries were inflicted — Joe, Ruthy, and appellant — were brought to Dr. Williams's office for examination. Dr. Williams took photographs of each suspect's teeth and obtained dental impressions, from which he made two sets of dental exemplars or casts. In examining the photographs and cast of appellant's teeth, Dr. Williams noted that his top teeth were not aligned with his bottom teeth and he had a large, visible gap between two teeth in the front. Dr. Williams scanned the dental casts of the three suspects and photographs of the child's bite marks onto his computer and sized them for comparison. He used Adobe Photoshop to remove the superfluous material and then created an overlay of each suspect's teeth to compare to the bite marks. Considering the physical parameters of each suspect's teeth, the unique pattern of contusions on the child's skin, and the closed population of suspects exposed to the child at the time the injuries were inflicted, Dr. Williams concluded that both Joe and Ruthy could be excluded as the person who inflicted the bite marks, but appellant could not be excluded as the person who inflicted the bite marks.

Appellant acknowledges that bite mark evidence has generally been deemed admissible. *See Spence v. State*, 795 S.W.2d 743, 752 (Tex. Crim. App. 1990). In *Spence*, the court of criminal appeals noted that while they had not found unanimous agreement on the proper predicate for determining admissibility of bite mark evidence, "our research has not yet led us to a single reported case where bite mark evidence has been ruled not to be admissible evidence." *Id.* The court further observed that while experts in the field do not agree on the exact number of similarities necessary to make a positive identification, "the

–11–

lack of agreement on the minimum number of concordant points on similarity, as well as what might be considered as the lack of sufficient background data goes to the weight and not the admissibility of such evidence." *Id.*

Yet appellant insists that *Spence* no longer holds any precedential value because it was decided before *Daubert* and the NAS identification of several deficiencies in the field of forensic odontology. The existence of deficiencies in a particular field, however, does not merit the wholesale exclusion of all evidence within that field. And there is nothing to suggest that the application of *Daubert* to the facts in *Spence* would yield a different result. Indeed, in a recent unpublished decision, the court of criminal appeals upheld the admission of similar expert testimony in the field of forensic odontology. *See Chanthakoummane v. State*, No. AP-75,795, 2010 WL 1696789, at *23 (Tex. Crim. App. April 28, 2010) (not designated for publication). In *Chanthakoummane*, both the State and the defense presented expert testimony concerning bite mark analysis.[2] *Id.* at *21–22. Unlike the case at bar, the State's expert utilized his analysis to positively identify the suspect rather than exclude suspects from a closed population. The expert testifying on behalf of the defense was highly critical of the State's expert's techniques, as well as the evidentiary value of the bite mark used for analysis. *Id.* at *22. These criticisms formed the basis for the defendant's *Daubert* reliability challenge. *Id.*

---

[2]Here, appellant was provided with an appointed expert and had the opportunity to refute Dr. Williams's testimony. For reasons not apparent in the record, appellant elected not to do so.

The court of criminal appeals rejected the defendant's argument that the testimony was not reliable and therefore inadmissable. In so concluding, the court reasoned that the State's expert followed the ABFO guidelines when conducting his analysis, and the opposing expert did not discredit the scientific theory or the technique of bite mark comparison. *Id.* at *23. Because the trial court was ultimately in the best position to evaluate the witnesses and their conflicting testimony, the high court deferred to the trial court's decision to admit the evidence. *Id.*

Appellant further argues that the bite mark evidence at issue here fails the "testability" prong of *Daubert* because it was not derived from techniques with known testing rates. Although Dr. Williams did concede that skin is a poor impression medium, he also explained that there can still be bite marks that have evidentiary value. In conducting his analysis in this case, Dr. Williams stated that he was conservative and only selected two of several pattern injuries that were likely bite marks. The two that were selected were marks that he believed met his high standard of evidentiary value. As to known error rates, Dr. Williams explained the difficulties in conducting studies on human bite marks. And as the State observes, because bite mark analysis is based partly on experience and training, the hard science methods of validation, such as assessing the potential rate of error, are not always appropriate for testing its reliability. *See Nenno*, 970 S.W.2d at 561. Reliability should be evaluated with reference to the standards applicable to the particular field in question. *See Coble*, 330 S.W.3d at 274. Moreover, the *Daubert* inquiry affords more flexibility than appellant's argument suggests. *See Daubert*, 509 U.S. at 588. While setting forth the factors

relevant to scientific reliability, the Supreme Court cautioned that "we do not presume to set out a definitive checklist or test." *Id.* at 589. We decline to impose such a checklist here.

Finally, with regard to the deficiencies in forensic odontology identified in the NAS report, we note that the NAS report does not conclude that bite mark evidence has lost general acceptance in the scientific community, nor does it call for universal exclusion of such evidence. To the contrary, the NAS report acknowledged that "[d]espite the inherent weaknesses involved in bite mark comparison, it is reasonable to assume that the process can sometimes reliably exclude suspects." *NAS Report, supra* at 176. The NAS Report further observed that the methods of collection of bite mark evidence are relatively noncontroversial; the dispute arises with regard to interpretation of the collected data. *NAS Report, supra,* at 176. Significantly, the evidence in this case was used for the very purpose the NAS deems reliable — to exclude suspects in a closed population. The State established that Dr. Williams's analysis was conducted in accordance with the ABFO guidelines, and appellant did not discredit the basic scientific theory or technique of bite mark comparison. To the extent appellant demonstrated deficiencies or limitations of the science, such limitations go to the weight of the evidence rather than its admissibility. *See Spence*, 795 S.W.2d at 752. On this record, the trial court could reasonably conclude that the field of expertise is legitimate, Dr. Williams's testimony was within the scope of that field, and Dr. Williams properly relied on established principles in that field. *See Nenno*, 970 S.W.2d at 561.

Consequently, we cannot conclude the trial court abused its discretion in admitting the evidence. Appellant's sole issue is overruled. The judgment of the trial court is affirmed.



MARTIN RICHTER
JUSTICE


Publish
TEX. R. APP. P. 47

110605F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

DAVID CESAR CORONADO, Appellant

No. 05-11-00605-CR    V.

THE STATE OF TEXAS, Appellee

Appeal from the 265th Judicial District
Court of Dallas County, Texas. (Tr.Ct.No.
F10-01245-R).
Opinion delivered by Justice Richter,
Justices Bridges and Lang participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered November 14, 2012.

_____
MARTIN RICHTER
JUSTICE