Affirmed and Opinion Filed August 23, 2018



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-16-01391-CR

**ROBERT ARTHUR MOSES, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 219th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 219-81377-2015**

## MEMORANDUM OPINION

Before Justices Bridges, Brown, and Boatright
Opinion by Justice Bridges

A jury convicted Robert Arthur Moses of first degree murder and sentenced him to life in prison. In six issues, he challenges the sufficiency of the evidence to support his conviction, the exclusion of his blood expert, and the admission of certain evidence. We affirm the trial court's judgment.

## Background

Anna Moses, the decedent, grew up in Russia and moved to the United States after meeting appellant. Appellant and Anna married and appellant treated Anna's young son, Igor, as his own. Anna was described as a beautiful, elegant woman who cared deeply for her family and friends.

Although the couple seemed to have a happy marriage, several of Anna's friends described appellant as controlling. It seemed the more educated Anna became, the less dependent she

became on appellant. Anna began enjoying other activities and hobbies that did not include appellant such as attending afternoon tea with Dr. John Wiorkowski, an elder, male co-worker who often gave Anna money when she needed it because he appreciated that she was always trying to better herself.[1] She also developed a strong friendship with Jerry Caspell based on their mutual interest in opera and musicals. He admitted he was infatuated with Anna and had dedicated two books of poetry to her; however, he was married and denied any romantic relationship with her.

Dr. Zharkynay Christian worked at University of Texas at Dallas with Anna, and they became friends based on their mutual Russian background. In December of 2012, Anna called her very upset after an incident involving appellant. Anna had locked herself in a closet with her two dogs and called police. Police reports from December 15, 2012 indicated Officer Brian Stubblefield was dispatched to the couple's home because of a 9-1-1 hang up call, but it was "a mistake." Reports did not indicate whether the caller was male or female.

Anna went to Dr. Christian's house because "I'm afraid he will kill me tonight." When Anna arrived, she "was so upset, like almost shaking." Anna talked on the phone to her mother, who still lived in Russia, for a long time and continued to cry. The next day, Anna and appellant reached "some agreement," and she returned home.

Appellant and Anna divorced in March of 2013. Appellant then moved into a house with three other divorced men and rented a room, which helped him financially.

Igor, a student at the UTD, saw his parents on the weekends and remained close to both of them. Anna continued living in the home after the divorce, and appellant often helped Anna with repairs. Anna never indicated to friends or family that she was afraid of appellant during

---

[1] He gave her $40,000 to pay for Igor's college living expenses, which he believed she would have paid back had she lived. He also gave her $6,000 for a European trip she was planning for the upcoming summer. He provided other monetary gifts when she expressed things she could not afford.

those times after the divorce. Igor saw them argue "every now and then, maybe, but not very often."

Anna also began dating through match.com. She met Michael Stodnick in January or February of 2014. By the end of the summer, they were exclusively dating. Stodnick and Anna had a standing Tuesday evening date each week.

On Tuesday, January 13, 2015, Anna set the security alarm on her home and left for work around 8:23 a.m. Anna worked as a statistical analyst in UTD's strategy department. She had tea around 2 p.m. with Dr. Wiorkowski.

Anna promptly left work at 5 p.m., as was her usual routine. Video surveillance cameras captured her walking into the parking garage at 5:02 p.m. and leaving the garage in her blue Hyundai sedan at 5:07 p.m. At 5:37 p.m., she used a credit card to buy a chicken quesadilla at Taco Bell and video surveillance showed her paying at the drive through window. Video surveillance outside an elementary school near her neighborhood captured a car matching the description of Anna's car passing by at 5:44 p.m.

Steven Carey lived three houses down and across the street from Anna. He had security cameras outside the front of his house. Footage showed a sedan driving by at approximately 5:46 p.m., but detectives could not say with certainty that it was Anna's car or whether a female was driving.

Stodnick and Anna had planned to meet that evening after he attended a 6 p.m. school meeting in Grapevine for his daughter. He texted Anna as he was leaving Grapevine at 7:03 p.m. but never heard back from her. He arrived at her home around 7:30 p.m. and noticed it was dark and her car was not in the driveway, which was unusual. Based on Anna's habit of not pulling her car in the garage unless there was bad weather, he assumed she was not home yet.

Stodnick rang the doorbell, called her name, and texted again but still got no response. He left and went to the Starbucks inside a nearby Tom Thumb for about fifteen minutes. He circled Anna's neighborhood again, but nothing had changed at her house so he drove back to Grapevine.

David Stafford, her neighbor across the street, was working in his home office late that afternoon. The office windows faced towards Anna's home. He said Anna regularly got home after 5:30, picked up the mail, and then parked her car in the driveway. He did not hear or see anything from her house between 5:45 and 8:30 p.m. on January 13th.

Igor had Tuesday evening classes at UTD from 5:30 p.m. to 6:45 p.m. and then from 7 p.m. to 9:45 p.m. Two female students confirmed his presence in class the night of the 13th. Video surveillance showed him at the campus pub at 9:49 p.m.

A man living in Anna's neighborhood testified there had been several car break-ins in the area that January and reported to police that he encountered men driving in the neighborhood around 11:15 p.m. on January 13th acting suspiciously.

The next day, Stodnick tried to reach Anna again. When he could not reach her at work, he reached out to her friends. They agreed it was unusual for her to be unresponsive. He returned to her house again (shortly after 9 a.m. on January 14th) and noticed her trash bins were still out front and packages were outside the front door. Otherwise, her home looked "normal." Stodnick had a house key, but did not go inside because he did not know her alarm code.

When Anna's friends confirmed that they had not heard from her, Stodnick notified the Frisco police department. An officer told him to speak with the UTD police since that was her last known location.

He went to the campus police and at first, they treated the situation as a woman who did not want to talk to her boyfriend. After Anna's boss called the police because she had not shown up for work, Stodnick's concerns were taken more seriously.

Officer Stubblefield, who responded to the 9-1-1 call in 2012, arrived at Anna's home on Wednesday, January 14th, around 10:50 a.m. to perform a welfare check. He did not see any signs of burglary or forced entry into the home. When no one answered the door, he "cleared the scene" and waited until Detective Lauren Hughes with the UTD police department arrived with Igor. Igor had a house key and the alarm code. Officers used Igor's key and the security code to enter the home. A report from Anna's alarm system confirmed the alarm was disarmed at 12:05 p.m., which was the first time it had been disarmed since the morning of January 13th.

When officers entered, the house was dark. Detective Hughes heard someone say, "there she is" from the direction of the garage. After she turned on the light in the garage, they found Anna's body on the garage floor. It was obvious Anna was dead, and her car was missing. Anna was still wearing her coat and scarf. Her purse was beside her, and the mail was scattered around her body. Her purse contained, among other things, three one hundred dollar bills. An empty Taco Bell sack with the quesadilla wrapper was found near her body.

Anna had abrasions on her left hand and a small abrasion on her right hand. Such marks were consistent with defensive wounds or a fall. Although Anna had been shot seven times (three times in the front, three times in the back, and one that did not penetrate her skin), eleven cartridge cases were recovered in the garage.[2] No one noticed any other bullet holes in the garage. Sergeant Nelson Walter thought something suspicious was going on at the scene because of the discrepancy of bullet wounds and casings found. The general consensus of officers at the scene was that the killer was trying to make the crime scene look like a robbery gone bad.

Despite trying to lift fingerprints from the patio door and the interior garage door, no prints were recovered. Nothing in the garage indicated who killed Anna.

---

[2] The medical examiner could not determine whether she was first shot in the front or back.

Shortly before midnight on January 14, 2015, Texas Ranger Rueben Mankin and Detective Brian Tschudy went to the home where appellant lived. Mankin noticed a band aid covering the backside of appellant's right hand. The band aid had a stain on the outside that was consistent with blood.

Detective Tschudy asked appellant to go to the station for some questioning. Appellant answered questions, but Mankin described his answers as "very vague." He told officers he had been home all day watching football. None of his other roommates were home to confirm his statement. He told officers he later went to Twin Peaks, and video surveillance showed him going to the bar at 7:06 p.m. and leaving at 7:57 p.m.

Despite his "vague" answers, appellant consented to a search of his bedroom, his cell phone, and firearms. Officers returned to the home around 1:30 a.m. on January 15th to conduct the search. They found several firearms in the search, including a .22 Ruger long rifle appellant built himself,[3] a .22 black pocket pistol, and a .22 black Browning Buck Mark target pistol. All of these were excluded as the murder weapon through testing.

While patrolling the area in the early morning hours of January 15th (around 1:51 a.m.), Officer William Lo noticed a blue Hyundai parked on the side of the road a couple blocks from Anna's home. A reading of the license plate indicated the car was stolen. He notified Detective Tschudy.

Detective Tschudy instructed officers to "photograph the car as is, do not touch it, do not go inside, and have it impounded and towed" for processing and a pending search warrant. Officer Lo noticed and photographed a muddy footprint on the hood of the car and more footprints on top of the car. Although gel prints were made from the prints taken off the hood, the gels were never compared to anyone.

---

[3] The bullets taken from Anna's body were consistent with bullets from a .22 long rifle caliber cartridge.

Officer Lo also noticed a red mark, which appeared to be blood, on the driver's seat. He took photographs of it and the rest of the car's interior through the window. A Red Bull can was on the floor of the backseat passenger side and a "very weathered" cigarette butt was on the floorboard. Anna did not smoke or consume energy drinks. Like the extra shell casings found in the garage, Detective Tschudy believed the can and the cigarette were planted in the car to tamper with the crime scene and throw off investigators.

When Ranger Mankin observed the car at the Frisco police department, he also noticed a red blood stain on the back, right driver's side seat that was consistent with the type of injury appellant had on his right hand. He believed it was likely a fresh stain because it was in a "high traffic area in the car," meaning an individual sitting in the car was likely to be rubbing against it. When Ranger Mankin asked appellant about the blood, appellant could not think of any reason why his blood would be in her car. In a second interview on January 28, 2015, appellant said the last time he was in Anna's car was when he fixed a broken water pipe in the garage.[4]

Detective Tschudy also saw a red bloodstain on the driver's seat of the car. Based on his training and experience, he thought it was "a newer, fresh bloodstain." It was not a saturating stain but "almost like a surface stain or like a graze or smear smudge . . . but it was bright red in color." He saw it again five days later (Monday, January 19th) at Garland DPS and said it had oxidized to more of a brownish, rustic color.

Nicole Mullins, a forensic scientist, conducted a presumptive test for three potential bloodstains. A stain in the cup holder was negative for blood, but one small stain on the driver's seat and another small stain on the upper right back part of the driver's seat tested positive.

---

[4] Igor testified Anna texted him about the broken pipe on November 25, 2014, and also texted appellant to come over in fix it. Conversations extracted from Anna, appellant, and Igor's phones indicated a pipe did break in Anna's home near that time. Nothing else indicated appellant had been in her car after that day.

Detective Ronald Robison canvassed the area where the car was found and talked to neighbors. Stephen Brockway testified that on January 14th, he and a friend were moving a trailer out of the neighborhood between 1 p.m. to 1:40 p.m. and there were no cars parked in that location. When Brockway returned around 3 p.m., he saw an SUV parked there. Another neighbor in the area noticed a blue Chevy truck parked on the street between 5 p.m. and 6 p.m. Based on these observations, the killer could have left Anna's car sometime after 6 p.m. on January 14th.

Detective Cory Kraft interviewed Stodnick and Caspell. Both men were cooperative and provided DNA samples. Stodnick denied owning any guns. Caspell admitted to owning a 9 millimeter Glock and a .22 target pistol. Detective Kraft did not retrieve either of these guns because at the time of the interview, he did not know what caliber of gun killed Anna. Toll records revealed that Caspell left his work in Arlington around 5:18 p.m. on January 13th, and he exited the Renner Road toll booth towards his home at 6 p.m. Once investigators determined Anna was killed between 5:50 p.m. and 5:55 p.m., they did not consider him a suspect so they did not feel his gun was a viable murder weapon.

Dr. Wiorkowski was excluded as a suspect after toll records confirmed he was in Garland/Rowlett on his way home at 5:47 p.m. Although he owned a .40 caliber Glock, officers knew this was not the type of gun that killed Anna.

Mullins performed the DNA analysis on the stains found in the car. Stodnick, Stafford, Wiorkowski, Caspell, Igor, Tschudy, and Mankin were excluded as contributors to the stain on the upper back driver's seat. Anna and appellant could not be excluded as possible contributors, as the stain was a mixture of two individuals. The stain on the driver's seat bottom was also a mixture of two individuals. Again, the other possible suspects were excluded, but Anna and appellant could not be excluded as possible contributors.

DNA testing on the Red Bull can and the cigarette butt did not match DNA from any individuals involved in the investigation, but rather was an unknown male. The profile was entered into CODIS (Combined DNA Index System) but did not match any profiles in the system.

As the physical evidence began to link appellant to the murder, officers began searching for a possible motive. Officers reviewed appellant's finances and talked with Anna's friends. They concluded appellant was the only person who stood to financially gain from Anna's death.

Stodnick told officers appellant became focused on money within a couple days of Anna's death. On January 16th, appellant gathered with several of Anna's friends and Anna's mother at a friend's home. Dr. Christian said appellant was acting odd. He asked for help translating and reading some of Anna's hand-written notes about her accounts and passport. He also asked Anna's mother about the location of Anna's jewelry.

Dr. Christian thought she overheard appellant say it would be good if he lived in Anna's home so he did not have to pay for two places. Anna's mother told him she agreed with "whatever Igor wants." Igor did not say anything during these conversations but was "just sitting there, like he was relaxing." Igor later testified it was not appellant's idea to move in. He wanted appellant to move in because he did not know anything about paying bills or taking care of a house.

Olga Mead also said appellant seemed more interested in possessions than a funeral. Tatyana Hieber described him as "very businesslike" and interested in her bank accounts, passwords, and other documents.

Frank Schoeberle, a friend of the family, was the independent executor of Anna's will. Appellant went to Schoeberle's home several times a week to discuss the estate, often uninvited. Schoeberle encouraged Igor to see a financial advisor, which he did. He also encouraged Igor to set up a trust; however, appellant told him to put money in a bank account.

On February 4, 2015, the bank account appellant shared with Igor received a $25,000 deposit. Igor explained the money was used to pay off the car he drove but appellant owned. Title of the car was then transferred to Igor. Money was also used to pay off the mortgage on Anna's house.

Igor was the beneficiary of Anna's life insurance policy worth $750,000. Although Detective Tschudy told the insurance company not to release the money to Igor because he could not be ruled out as a suspect until all court proceedings were complete, Igor eventually received the $750,000.

Although the police investigation revealed that several men were involved in Anna's life, each of these men were excluded as the killer based on DNA testing and toll records of their cars around the time of Anna's death. Officers considered other leads and the possibility of an unknown male killer, but based on appellant's blood in the car, his lack of a solid alibi, their marriage history, and his financial gain from Anna's death, officers arrested appellant and charged him with murder.

The jury considered the two stories presented about Anna's death: The State's version of a controlling ex-husband who benefitted financially from her death and the defense version of a shoddy police investigation that overlooked evidence and other suspects and instead focused on a father who stepped in to help his young adult son who had lost his mother and was inexperienced with finances. The jury believed the State, found appellant guilty of Anna's murder, and sentenced him to life in prison. This appeal followed.

**Sufficiency of the Evidence**

Appellant argues the evidence is legally insufficient because his murder conviction was based on nothing more than pure conjecture and speculation. He relies specifically on the following: (1) no evidence proving Anna's time of death; (2) no murder weapon linking him to the crime; (3) no evidence of appellant's motive; (4) insufficient evidence he was in Anna's car on

January 13th or 14th; (5) no evidence excluding other potential suspects; (6) and numerous failures by officers to investigate other evidence that could have implicated other suspects. Thus, he contends the evidence against him merely raises the possibility of guilt, or perhaps even a strong presumption of guilt, but it is nonetheless legally insufficient. *See Walker v. State*, PD-1429-14, 2016 WL 6092523, at *12 (Tex. Crim. App. Oct. 19, 2016) (not designated for publication) ("A conviction based upon juror speculation raises only a suspicion of guilt, and mere suspicion is inadequate to satisfy the constitutional sufficiency standard that requires proof beyond a reasonable doubt.").

Appellant is guilty of murder if he intentionally and knowingly caused the death of Anna by shooting her with a firearm. TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2011). In reviewing the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the prosecution in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id*. The trier of fact is the sole judge of the weight and credibility of the evidence. *See* TEX. CODE CRIM. PROC. ANN. art. 38.04; *Brown v. State*, 270 S.W.3d 564, 568 (Tex. Crim. App. 2008). We may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). Instead, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007). We must presume that the factfinder resolved any conflicting inferences in favor of the prosecution and defer to that resolution. *Jackson*, 443 U.S. at 326.

The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor. *Hooper*, 214 S.W.3d at 13.

Appellant relies on evidence of Anna's stomach contents after her death to challenge the time of her death. Dr. William Rohr testified that Anna's stomach contained 300 milligrams of chyme, described as food that has been in the stomach "for a longer period of time, at least long enough so that it looks completely digested, and it just kind of has a creamy, homogenous appearance." Thus, he was unable to recognize any kind of food in the contents of her stomach. Dr. Rohr testified that if Anna had eaten a chicken quesadilla on her way home around 5:45 p.m. and was shot ten minutes later (according to the State's time line), it would be reasonable for the contents of her stomach to be partially digested. If Anna had eaten right before her death, he would have expected to see something different, and he would have described her stomach contents differently in the autopsy report.

Dr. Rohr explained the process of digestion can take anywhere from two to six hours depending on the type of food and how much was eaten. He could not definitively say how long it takes food to digest to chyme; however, it would take longer than fifteen minutes for a chicken quesadilla to digest into chyme. Based on this testimony, appellant argues Anna could not have been killed between 5:45 p.m. and 5:50 p.m. Instead, she was killed sometime after 7 p.m., giving appellant an alibi based on his presence at Twin Peaks and destroying all the other suspects' alibis. However, appellant's theory overlooks the fact that no one knows what happened to the quesadilla. While he contends the most "logical" inference is that Anna ate it on her way home, this theory presumes she arrived home, got her mail, and then sat in her car for a couple hours until she was killed.

The jury was free to reject appellant's theory and instead believe, based on video surveillance of Anna's movements that day, that she arrived home around 5:45 p.m, picked up her mail, and was ambushed by the killer as she was going inside her house. Accordingly, the jury was free to determine the conflicts in evidence and conclude appellant was the only suspect who did not have an alibi at the time of Anna's death.

Appellant argues no murder weapon was ever found. However, the jury heard evidence that appellant had the means to kill her. He was familiar with guns based on his ownership of several firearms, including the caliber-type that killed Anna. He served in the military, and Detective Tschudy testified that based on the tight groupings of the gunshot wounds, the killer had experience with guns and marksmanship.

Appellant further argues officers should have tested appellant's and other suspects' clothes for gunshot residue. Officers interviewed appellant hours after the murder. It was likely he had washed his hands or showered during that time, which would invalidate the test results. Detective Tschudy explained gunshot residue testing is not highly sought after for evidentiary purposes because there are too many false positives. "The FBI doesn't even recognize it as a valid test." Thus, it was reasonable for officers to decide not to test for gunshot residue.

Appellant next contends there was no evidence of appellant's motive to kill Anna. First, motive is not an element of murder, but rather a circumstance indicative of guilt. *See Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013); *see also Delacruz v. State*, 278 S.W.3d 483, 491 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd) (State does not have to prove motive in a murder prosecution). However, appellant concedes the State presented evidence of financial gain as a possible motive, but asserts the motive was "wholly unreasonable" because Igor was the beneficiary of the life insurance and there was no evidence appellant received any of it. Appellant's assertion overlooks the other financial benefits he received from Anna's death. When

–13–

the couple divorced, he was forced to move out of a two-story home and rent a bedroom in a home with three other men. A review of his financial records indicated he had several credit cards that were nearly maxed out.[5] Given his income of approximately $1600 from social security, he had a significantly high debt-to-income ratio. On February 4, 2015, the bank account appellant shared with Igor received a $25,000 deposit from the estate, which helped pay off his car and helped pay for the home appellant immediately moved back into after Anna died.

The jury also heard from numerous witnesses that appellant seemed more concerned about probating Anna's estate than the murder investigation. He asked Anna's mother about her jewelry days after the murder. He encouraged Igor to put money into a bank account rather than a trust. However, the jury also heard testimony that Anna "babied" Igor and cared too much for him rather than teaching him how to take care of himself and be a "man." Thus, the jury heard the defense's theory that appellant's actions after Anna's death were those of a caring father trying to make decisions for his adopted son, who was ill-equipped to make such decisions. The jury did not believe it. The jury, when faced with conflicting evidence about appellant's motivations, resolved these inconsistencies in favor of the State's theory that appellant killed Anna for personal monetary gain. *Jackso*n, 443 U.S. at 326 (we must presume factfinder resolved conflicting inferences in favor of the prosecution).

Appellant next argues it was "wholly unreasonable" for the jury to conclude the presence of appellant's blood in Anna's car proves his guilt, as there was no evidence he was actually in her car on January 13th or 14th. He argues there is no evidence suggesting *how* his blood was deposited in the car because the police assumed the killer wore gloves. He also asserts there is no evidence appellant had the opportunity to abandon her car because he was being interviewed by

---

[5] One card with a $10,000 limit had a $9,967.40 balance on December 29, 2014. Another card with a $3,600 credit limit had a balance of $3,577.61 on December 25, 2014. And another one with an $11,500 limit had a $11,348.49 balance on December 11, 2014. Appellant owed $14,497.36 on his car.

the police when her car was discovered. Neighbors in the area could only confirm that a blue Chevy truck was parked in the location between 5 p.m. and 6 p.m. Thus, appellant ignores the fact it was reasonable for the jury to conclude that appellant abandoned Anna's car sometime before the police interviewed him late that night of the 14th and when they found the car around 1:50 a.m. on the 15th. Further, appellant had a cut on his right hand that coincided with the location on the driver's seat where DNA testing confirmed the presence of his blood. When first interviewed by police, appellant could not explain why his blood would be in her car. His statement to police about his whereabouts on January 13th was "very vague," but he provided other very specific details about prior interactions with Anna such as fixing a water filtration system for her in the garage. Although Igor testified the stain had been there for years, the jury was free to disbelieve him and instead believe Stodnick, who testified Anna kept her car "incredibly clean" and she would have "absolutely" tried to clean a blood stain if she saw it in her car.

Ultimately, no one could confirm appellant's whereabouts between 6 p.m. and 6:30 p.m. on January 13, 2015. Accordingly, the jury could have reasonably concluded appellant was the only person with the motive, means, and opportunity to kill Anna. *See Temple*, 390 S.W.3d at 360 (motive, means, and opportunity are indicators of guilt).

To the extent appellant argues Wiorkowski, Caspell, Stodnick, Igor, and an unknown male were not excluded as suspects, his entire premise is based on a fallacy in the State's time line of Anna's death because of the contents of her stomach and the missing quesadilla. As discussed above, the jury was free to believe the State's time line of her death based on surveillance videos of Anna's movements that evening and the crime scene where she was discovered.

Finally, appellant attacks the officers' investigation of the murder for numerous reasons including, but not limited to: (1) failing to test the Taco Bell bag and wrapper for DNA; (2) failing to compare the gel footprints from Anna's car to any of the suspects; (3) failing to follow up on

the "very suspicious lead" from the campus police about the unknown Hispanic male who posed as Igor's father and tried to get into his apartment after the murder; (4) discounting the possibility Anna was murdered as part of a robbery because the credit card she used to buy the quesadilla was never found; and (5) failing to completely audit Anna's finances and explain how she increased her net worth from $4,745 to $111,880 in twenty-three months and only withdrew $150 in cash during that time but had three one hundred dollar bills in her purse when she was murdered.

Appellant asserts the police developed a time line for Anna's death before having all the evidence and then stopped investigating any leads that did not fit with their belief appellant killed her. He supports his claim through Detective Tschudy's statement that "We started getting in evidence, and once the evidence starts to lead certain directions, that's where we go." However, we do not review the sufficiency of the police investigation, but rather review the evidence presented at trial. *See McLemore v. State*, No. 05-15-00160-CR, 2015 WL 9591398, at *3 (Tex. App.—Dallas Dec. 31, 2015, no pet.) (mem. op., not designated for publication). As such, appellant's attacks on the police investigation are not relevant to our analysis, and we give proper deference to the jury's verdict.

As explained above, the evidence the State presented established appellant did not have an alibi for the time Anna was killed. He stood to achieve financial gain from her death, and his blood was found in her car. Moreover, officers investigated whether Anna had ties to illicit criminal activities but found no evidence of such activities.

Officers did not believe it was a robbery because Sergeant Nelson explained that in most robbery cases in which a person steals a credit card, the person tries to use it right away and purchase merchandise before it is reported stolen. Here, Anna's missing credit card was not used within the couple days after her death. Three hundred dollars in cash as also left in her purse. Further, her car was not missing any parts, and the keys were found under the driver's seat. Rather

–16–

than a robbery, investigators believed the crime scene was staged to throw them off the real killer. Ranger Mankin said the suspect was probably "somebody that watched NCIS," and appellant admitted he had taped NCIS.

In assessing the sufficiency of the evidence, we have a duty to "ensure that the evidence presented actually supports a conclusion that the defendant committed the crime that was charged." *Winfrey*, 323 S.W.3d at 882. The legal sufficiency standard of review does not require us to decide "what happened," rather, we only have to be satisfied that a jury could rationally answer that question for themselves beyond a reasonable doubt. *See Walker*, 2016 WL 6092523, at *14; *see also Boyce v. State*, No. 05-15-01360-CR, 2017 WL 3498475, at *16 (Tex. App.—Dallas Aug. 16, 2017, pet. ref'd) (mem. op., not designated for publication).

Although the jury relied on circumstantial and scientific evidence, appellant's conviction "was not a determination so outrageous that no rational trier of fact could agree." *Wirth v. State*, 361 S.W.3d 694, 698 (Tex. Crim. App. 2012). Thus, we are satisfied a jury could rationally answer "what happened" to Anna beyond a reasonable doubt. *Walker*, 2016 WL 6092523, at *14. Accordingly, the evidence is legally sufficient to support appellant's murder conviction. We overrule his first issue.

### Exclusion of Blood Expert

In his second issue, appellant argues the trial court abused its discretion by excluding his expert's testimony regarding the scientific impossibility of determining a bloodstain's age. The State responds the trial court did not abuse its discretion by excluding the testimony because officers can testify to personal observations. Further, the State asserts appellant was not prevented from presenting the substance of his defense, and the State presented other evidence to demonstrate that the bloodstain was recently deposited in Anna's car.

We review a trial court's ruling on the admissibility of expert testimony for an abuse of discretion. *Coronado v. State*, 384 S.W.3d 919, 923 (Tex. App.—Dallas 2012, no pet.). Such rulings will rarely be disturbed by an appellant court. As with other types of evidentiary rulings, we will uphold the trial court's decision unless it lies outside the zone of reasonable disagreement. *Id.* If the record supports the trial court's decision, there is no abuse of discretion. *Id.*

A trial court's decision to exclude evidence may violate an accused's constitutional right to present a defense. *See Potier v. State*, 68 S.W.3d 657, 665 (Tex. Crim. App. 2002). This fundamental right is violated if the excluded evidence forms such a vital portion of the case that exclusion effectively precludes the defendant from presenting a defense. *Id.*

Appellant hired Dr. Michael Spence, a self-employed consultant focusing on forensic biology and DNA, to consult on the DNA and forensic issues involved in the case. The defense asked him to render expert opinions on transfer of trace DNA and bloodstains.

In a hearing outside the jury's presence, Dr. Spence explained he would testify to "the lack of ability to determine how long [bloodstains] have been there." Specifically, he said he would give the following opinions about bloodstains:

> I'd say, first and foremost, the bloodstain. Blood is red when it comes out of the body. We all see that. We have seen that from skinning our knees as a child. Over a very short period of time of drying out, that blood does change color at different rates and different circumstances, different substrates that the blood is being deposited on. It's going to change differently, but it does change to more of a reddish-brown color.

He also planned to testify about the results of published articles trying to determine the age of a bloodstain; however, he admitted he only reviewed them and had not conducted any of his own research.

The State objected to Dr. Spence testifying to any opinion regarding the bloodstain evidence because "he's just relaying history . . . I don't think he has shown that he has the expertise to be able to testify to that." The trial judge asked if Dr. Spence would be giving an opinion on

–18–

whether or not it was possible to determine how long a particular bloodstain may have been in a particular location. Dr. Spence answered, "I'm going to offer the opinion that it is impossible to do that just by looking at it. There are means to study the age of bloodstains, but those are in development, and none of those are, to my knowledge, validated or in use in any laboratory system that I know of." Determining the age of a bloodstain "requires more than simply looking at it." The trial judge indicated his skepticism of needing an expert witness because it seemed like a "common-sense opinion."

Defense counsel argued the State presented their detectives as experts "with their expert notice" of the bloodstain in the car so Dr. Spence would rebut those opinions. However, no objection was raised to their testimony and the court stated, "I can only call the pitches that are thrown." The trial court ultimately ruled that having an expert testify that "it takes more than just looking at it to tell how old it is" is not a subject for expert testimony because it "is like having a meteorologist testify that rain is wet." An expert's testimony would give undue weight to the testimony. The trial court emphasized defense counsel could argue it "all the livelong day in your closing, but he can't give that opinion."

At trial, Detective Tschudy testified, without objection, that based on his training and experience, he thought the bloodstain in Anna's car was "a newer, fresh bloodstain." It was not a saturating stain, but "almost like a surface stain or like a graze or smear smudge . . . but it was bright red in color." During cross-examination, defense counsel asked if he had information "that you could never determine the freshness of a stain?" He answered, "That is coming from DPS. They probably won't go on the record saying 'fresh.' It's hard to determine that."

Ranger Mankin testified, without objection, that the stain was in a high traffic area in the car, "So to me, that was apparent that it was likely to be a fresh stain." Appellant asserts their

testimony left the impression with the jury that they "possessed some form of street-wisdom concerning the age of bloodstains" that his expert should have been allowed to rebut.

Despite appellant's characterization of the testimony, neither witness testified as an expert on bloodstains but instead provided a lay opinion based on their observations. A police officer is entitled to provide a lay opinion that is rationally based on his perceptions, as well as his training and experience. *See Osbourn v. State*, 92 S.W.3d 531, 539 (Tex. Crim. App. 2002) (officers may provide lay opinions based on personal observations); *see also Lozoya v. State*, No. 08-15-00278-CR, 2017 WL 4277307, at *4 (Tex. App.—El Paso Sept. 27, 2017, no pet.) (not designated for publication) (officer testified he observed what he believed to be blood on a knife).[6] Further, Dr. Spence's opinion was not relevant to challenge their observations because he did not see the bloodstain in the condition that they did. *See Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011) (expert testimony is admissible if it is relevant to the issue in the case). Moreover, he agreed it is "common sense" that "[i]f you get a cut where blood comes out . . . it will be red." *See Blumenstetter v. State*, 135 S.W.3d 234, 249 (Tex. App.—Texarkana 2004, no pet.) ("When the jury is equally competent to form an opinion about the ultimate fact issue or the expert's testimony is within the common knowledge of the jury, the trial court should exclude the expert's testimony.").

Further, Dr. Spence testified DNA testing cannot determine the age or time at which a stain was deposited. "It's a wonderful technology, but it can't answer the how or the when." Accordingly, the jury would not have thought that the officers were able to determine the age of the bloodstain when Dr. Spence testified to the contrary. Thus, although the trial court refused to

---

[6] The State concedes it has not found any Texas case on point regarding an officer's testimony about the freshness of blood, but it cites several other state courts who have allowed such testimony. *See Thompson v. Conn.*, 147 S.W.3d 22, 38 (Ky. 2004) (holding it does not require expertise to observe whether blood is fresh or dried); *Franklin v. State*, 405 So.2d 963, 965 (Ala. Cr. App. 1981) ("the police officer merely gave his opinion as the 'freshness' of a blood stain, a matter of common knowledge, which stain he personally viewed"); *People v. Krone*, 424 N.E.2d 917, 921 (Ill. App. Ct. 1981) ("it is not necessary to qualify a police officer as an expert for the purpose of identifying fresh blood").

explicitly let him testify that the age of a bloodstain cannot be determined, this conclusion was implicit in his testimony regarding DNA. As such, appellant's argument that he was unable to rebut a false impression with the jury is not supported. In addition, defense counsel elicited testimony from Detective Tschudy that it is hard to determine the freshness of blood. Accordingly, we conclude the trial court did not abuse its discretion by excluding Dr. Spence's testimony.

In reaching this conclusion, we likewise conclude the trial court did not violate appellant's constitutional rights to present his defense by excluding such testimony. The fact that a defendant may not get to present his case to the extent or in the form he desired is not prejudicial when he was not prevented from presenting the substance of his defense to the jury. *Potier*, 68 S.W.3d at 666.

Appellant presented evidence challenging the State's assertion that the bloodstain was fresh. Igor testified the stain had been on the seat for "quite a long time . . . since like high school." Dr. Spence explained the age of a bloodstain cannot be determined through DNA testing. He also testified that based on his experience in the lab, fresh blood dries quickly, which challenged the officers' observation of "fresh" blood in Anna's car hours after it was found. Through cross-examination, Detective Tschudy acknowledged that DPS would not "go on the record" calling a bloodstain "fresh" because it is "hard to determine." During closing argument, appellant challenged the theory that the killer wore gloves because, "If you are wearing gloves, you're not leaving blood in the car. That blood came at a different time, folks." As such, appellant presented the substance of his defense regarding the timing of the blood in the car. The exclusion of Dr. Spence's testimony did not result in the denial of a constitutional right. Appellant's second issue is overruled.

**Perjured Testimony**

–21–

In his third issue, appellant argues the State's use of perjured testimony violated his constitutional right to due process and due process of law.  Specifically, he complains the State relied on perjured testimony when it allowed Detective Tschudy to testify before the jury that Anna's killing was not part of a robbery because he knew as early as January 16, 2015 that the credit card used at the Taco Bell was missing.[7]  The State responds appellant failed to preserve his issue for review, or alternatively, the record does not support his claim that Detective Tschudy's testimony was false or material.

To preserve an issue for review, an appellant must present to the trial court a timely request, objection, or motion stating the specific grounds for his complaint.  TEX. R. APP. P. 33.1.  It is undisputed appellant did not object to Detective Tschudy's alleged false testimony during trial.  Rather, appellant raised his complaint in a footnote as part of his sufficiency challenge in his motion for new trial.  Although appellant claims this was timely because the State has a duty to correct false testimony and "this is not something that defense counsel can ascertain until the trial is concluded," we disagree.

As appellant acknowledges, rule 33.1 "simply requires an objection to be made at the earliest opportunity."  In doing so, this allows the trial court to correct any possible error.  However, a defendant's failure to object may be excused if he could not reasonably have known that the testimony was false at the time it was made.  *See, e.g., Estrada v. State*, 313 S.W.3d 274, 288 (Tex. Crim. App. 2010).

Here, the record indicates appellant knew Detective Tschudy's testimony was allegedly false as he testified.  Defense counsel thoroughly cross-examined Detective Tschudy on when he first knew the credit card was stolen and even forced Detective Tschudy to concede that he

---

[7] Detective Tschudy also knew about the missing credit card prior to his grand jury testimony, in which he said the killing was not a robbery because nothing was taken.

prepared a power point presentation for the grand jury that said, "This was not a robbery because nothing was taken from her purse." Detective Tschudy thought Ranger Mankin would confirm that he told him the credit card was missing; however, Mankin was unaware the credit card was missing until asked about it at trial. Accordingly, appellant failed to object to any false testimony at the earliest opportunity to preserve his complaint. *See Haliburton v. State*, 80 S.W.3d 309, 315 (Tex. App.—Fort Worth 2002, no pet.) ("Although Appellant now complains that these two witnesses lied under oath, he failed to lodge an objection of any kind *when the two testified*."); *see also Castillo v. State*, No. 04-11-00422-CR, 2013 WL 781776, at *13 (Tex. App.—San Antonio Mar. 1, 2013, pet. ref'd) (mem. op., not designated for publication) (failing to lodge a timely and specific objection "when the allegedly false testimony was offered into the record" waived the issue). Appellant's failure to object was not excused because the record indicates he was aware of the alleged false nature of the testimony at the time Detective Tschudy was on the witness stand. Accordingly, appellant's third issue is overruled.

**Evidence Issues**

In his final three issues, appellant challenges the admission of certain evidence. We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016). A trial court abuses its discretion when the decision falls outside the zone of reasonable disagreement. *Id.*

After overruling appellant's pretrial motions in limine, the trial court allowed the State to introduce the following evidence: (1) medical and counseling records containing statements that appellant had an affair prior to their divorce; (2) notes written in Russian found in Anna's locked desk drawer that said things such as, "How can I protect myself financially before filing divorce," and expressed her concern appellant would "try to ruin me while I try friendly divorce," and "He says that he will kill himself and will write a letter to the child that I drove him to suicide, and

–23–

other disgusting things, and that the child will not want to associate with me"; and (3) Dr. Christian's testimony regarding Anna's phone call in December of 2012 in which she expressed fears appellant was going to kill her that night.

We begin by addressing Anna's Russian notes. Appellant concedes in his reply brief that he failed to preserve error under rules 403, 404(b), and article 38.36. However, appellant also argues admission of the notes violated his right to confrontation. Despite acknowledging his failure to object to the trial court, he urges this Court to consider his issue because "For far too long, the State has been able to avoid reversal of what are plainly constitutional errors affecting the substantial rights of the accused by capitalizing on ingenuous or incomplete objections lodged by trial counsel, when the substance of why that piece of evidence is inadmissible is readily apparent." We reject appellant's invitation. Error, even constitutional error, may be forfeited if appellant failed to object. *Fuller v. State*, 253 S.W.3d 220, 232 (Tex. Crim. App. 2008); *see also Robinson v. State*, 310 S.W.3d 574, 577 (Tex. App.—Fort Worth 2010, no pet.) (preservation requirements apply to confrontation clause complaints). Because appellant failed to preserve any of his complaints regarding admission of the Russian notes, his fifth issue is overruled.

We now consider whether the trial court abused its discretion by admitting medical and counseling notes discussing appellant's affair prior to their divorce and evidence of a domestic incident in December of 2012. Appellant objected at trial that the evidence was not relevant and highly prejudicial under rule 403. The trial court overruled both objections.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of an action more probable or less probable than it would be without the evidence." TEX. R. EVID. 401. Article 38.36 of the code of criminal procedure provides in part that, "[i]n all prosecutions for murder, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances . . . going to show the condition of the

–24–

mind of the accused at the time of the offense." TEX. CODE CRIM. PROC. ANN. art. 38.36(a) (West 2005). Evidence under article 38.36 is still subject to exclusion under rules 403 and 404(b). *See Smith v. State*, 5 S.W.3d 673, 679 (Tex. Crim. App. 1999). Rule 404(b) provides that "Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identify, or absence of mistake or accident." TEX. R. EVID. 404(b).

The nature of the relationship, such as whether the victim and the accused were friends, were co-workers, were married, estranged, separated, or divorcing, is clearly admissible under article 38.36(a). *See Garcia v. State*, 201 S.W.3d 695, 702 (Tex. Crim. App. 2006). Further, in some instances, prior acts of violence between the victim and the accused may be offered to illustrate the nature of the relationship. *Id*.

Here, the nature of appellant's and Anna's relationship was a material issue; therefore, evidence of this relationship was relevant because the State believed Anna was killed by someone she knew and had a personal relationship. *See Bailey v. State*, No. 05-13-01536-CR, 2015 WL 1649946, at *9 (Tex. App.—Dallas Apr. 13, 2015, no pet.) (not designated for publication) ("What issues are material will depend on the theories of the prosecution and the defense."). The notes from a December 23, 2008, counseling session revealed a woman who "presented in [an] agitated and anxious state" after learning of the affair. The notes from a December 29, 2008, session stated she was calmer, but "anxious about being on her own, feeling indebted to [appellant] for staying and helping with son's cancer battle."

Anna was described as a private woman who did not talk much about her relationships; therefore, this evidence provided an insight into her marriage in which she felt scared about leaving appellant, anxious about being on her own, and indebted to him for previously supporting Igor's

battle with cancer. Because the evidence of their relationship was material, the State was allowed to present such evidence under the "other purposes" clause of rule 404(b) because it had a purpose other than showing bad character and the defendant acting in conformity therewith. *See, e.g., Chavez v. State*, 399 S.W.3d 168, 172 (Tex. App.—San Antonio 2009, no pet.) (relationship was material issue and evidence helped illustrate nature of relationship and possibly explained victim's fear of defendant). To the extent appellant argues the evidence was too remote to consider, neither article 38.36 nor rule 404(b) limits the time period for which such evidence may be admissible. *See, e.g., Brock v. State*, 275 S.W.3d 586, 590 n.3 (Tex. App.—Amarillo 2008, pet. ref'd).

Evidence, while relevant and otherwise admissible under rule 404(b) and article 38.36, may still be excluded under rule 403 if the appellant demonstrates the damaging nature of the evidence outweighs its probative value. *See Chavez*, 399 S.W.3d at 173. Appellant argues the "salacious, irrelevant evidence [] motivated the jury to abandon its oath and convict Robert Moses despite the absence of legally sufficient evidence." We disagree. As previously discussed, the evidence was relevant to illustrate his relationship with Anna. Nothing in the record suggests the jury had a reasonable doubt that appellant murdered Anna, but instead convicted him based on evidence of an affair. Rather, appellant was convicted based, in part, on evidence of his blood in her car and no alibi proving his whereabouts at the time of her murder. Accordingly, the trial court did not abuse its discretion by admitting Anna's medical and counseling notes. Appellant's sixth issue is overruled.

Finally, appellant argues the trial court abused its discretion by allowing Dr. Christian to testify about a domestic incident that occurred in December of 2012. Anna asked to come to her house because "I'm afraid he will kill me tonight." As previously stated, the nature of their relationship was a material fact. "In cases in which the prior relationship between the victim and the accused is a material issue, illustrating the nature of the relationship may be the purpose for

–26–

which evidence of prior bad acts will be admissible." *Bailey*, 2015 WL 1649946, at \*9 (citing *Garcia v. State*, 201 S.W.3d 695, 703 (Tex. Crim. App. 2006)). Neither article 38.36 nor rule 404(b) limits the time period for which such evidence may be admissible. *See, e.g., Brock*, 275 S.W.3d at 590 n.3. The fact that the incident happened three years before the murder does not make it irrelevant or inadmissible under article 38.36 or rule 404(b). *See id.* (prior hostile offenses by defendant against victim six years before her death admissible). Likewise, as explained above, the alleged damaging nature of the evidence was not outweighed by its probative value. Accordingly, the trial court did not abuse its discretion by admitting evidence of a domestic incident. To the extent appellant argues this evidence violated his right to confrontation, his argument is not preserved because he did not raise it in the trial court. TEX. R. APP. P. 33.1; *Fuller*, 253 S.W.3d at 232; *see also Robinson*, 310 S.W.3d at 577). Appellant's fourth issue is overruled.

## Conclusion

Having overruled all of appellant's issues, the judgment of the trial court is affirmed.


/David L. Bridges/
DAVID L. BRIDGES
JUSTICE

Do Not Publish
TEX. R. APP. P. 47
161391F.U05

–27–



# Court of Appeals
# Fifth District of Texas at Dallas
## JUDGMENT

ROBERT ARTHUR MOSES, Appellant

No. 05-16-01391-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 219th Judicial District Court, Collin County, Texas
Trial Court Cause No. 219-81377-2015.
Opinion delivered by Justice Bridges.
Justices Brown and Boatright participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered August 23, 2018.